**MIDDLE EAST AGENCY, Inc., et al. v. THE JOHN B. WATERMAN et al.**

United States District Court
S. D. New York.
June 22, 1949.

Hill, Rivkins & Middleton, New York City, proctors for libelants (Arthur O. Louis, Mark T. Walsh, New York City, advocates).

Gay & Behrens, New York City, proctors for respondent (Edward J. Behrens, New York City, advocate).

LEIBELL, District Judge.

Libelant, Middle East Agency, Inc. of New York City, was the owner of eleven TD–9 Tractors which were shipped uncrated in good order from Honolulu, T. H. to the port of New York on the S. S. John B. Waterman on March 7, 1947.

Libelant, Frazer Duntile Co., Ltd., of Ottawa, Canada, was the owner of a rock crusher which was shipped in good order (knocked down), in 21 items, on the same vessel for the port of New York. Five large parts of the rock crusher were shipped on skids; other parts were shipped in eleven crates and four cases; and one large piece was shipped as such.

The eleven tractors and the rock crusher items were stowed in the No. 3 lower hold. They were improperly stowed and were badly damaged on the voyage to New York. Respondents have not really contested the charge of improper stowage.

The No. 3 lower hold had two deep tanks at the after end. They extended up to the lower 'tween deck. The coamings on the tank hatches had 8 inch vertical plates. The large (9′ x 12′) steel covers of the two deep tank hatches, in which there was water for ballast, were not dogged down before the ship sailed for New York. There were double bottom fuel oil tanks beneath the floor of the No. 3 lower hold. The manhole covers of the fuel oil tanks were on the floor of the No. 3 lower hold, slightly elevated.

During a storm on March 25th in the vicinity of Cape Hatteras it was learned that the cargo had shifted in the No. 3 lower hold. The vessel developed a list. On arrival at the Port of New York the No. 3 lower hold was examined and it was found that the tractors and the parts of the rock crusher had broken loose; that the manhole plates on the starboard double bottom fuel oil tank had been sheared off by the shifting tractors and machinery; that an undogged steel cover of the port deep tank had been lifted by the surge of the water in the tank due to the rolling of the vessel and had skidded to the starboard side; that the starboard deep tank cover was in place but not secured; that about 8 feet of water from the port deep tank had spilled over from the 'tween decks down into the No. 3 lower hold and had flowed into the double bottom fuel oil tanks, whose manhole plates had been sheared off; that fuel oil had become mixed with the water and covered the No. 3 lower hold, the broken tractors and the machinery parts, with a heavy oily sludge. Frank E. Bagger, an expert ship and engineer surveyor, who inspected the No. 3 lower hold in New York on April 2, 1947, described it as one of the worse messes he had ever seen. Photographs, Exs. 11A to 11–I.

All of the tractors were damaged or broken: six were broken in parts; the others were so badly broken that two consisted only of the Diesel power unit, and all that remained of three were small broken pieces. All were covered with fuel oil. Some of the parts had fallen into the fuel oil tank.

The cases and crates containing parts of the rock crusher were demolished. No parts of the wooden skids were distinguishable. The machinery was bare. The 21 items of the rock crusher listed in the bill of lading were delivered in 43 pieces. Some of the larger items did not appear to be damaged but all were coated with fuel oil.

The respondents plead as special defenses that the bills of lading for these two shipments contained express statements that they were subject to the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. The First special defense alleges that if the loss resulted from unseaworthiness it was not due to the want of due diligence on the part of the carrier to make the ship seaworthy. T. 46 U.S.C.A. § 1304, subd. 1. The Second separate defense is based on subdivision (2) (a) of Section 1304 and alleges that the damage resulted from the acts, neglect and default of the master or servants of the carrier in the navigation or in the management of the ship. In the Third separate defense, based upon subdivisions (2) (c) and (d) of said section, it is alleged that the damage resulted from perils, dangers, and accidents of the sea and Act of God. The Fourth

separate defense, based on subdivision (2) (q) of said section, alleges that the damages resulted from causes arising without the actual fault or privity of the carrier and without the fault or neglect of the agents or servants of the carrier.

■ The vessel was unseaworthy in that the steel covers of the two deep tank hatches were not dogged down. The stormy weather was encountered off Cape Hatteras on March 25th and 26th. There were very heavy seas, a heavy rain squall and at times a windforce of 9 and 10 on the Beaufort Scale. But that kind of weather in the North Atlantic at that time of the year, The Schickshinny, D.C., 45 F.Supp. 813, at page 817, should have been anticipated in the stowage of this cargo. The damage was not due to the perils of the sea or an Act of God. "A common carrier has the burden of proof to bring the loss within an exception." Edmond Weil, Inc., v. American West African Line, 2 Cir., 147 F.2d 363, 366; Petition of Howard, D.C., 53 F.Supp. 556. The unseaworthiness of the vessel and the improper stowage caused the damage to this cargo.

The real issues presented at the trial were based on the Fifth and Sixth defenses, which plead the limitation of liability provisions of the Carriage of Goods by Sea Act, T. 46 U.S.C.A. § 1304(5)[1], and paragraph (r)[2] of the bill of lading.

The Fifth defense alleges: "36. If the respondents are held liable for any loss or damage to or in connection with the transportation of the goods mentioned in the amended libel, they plead the benefit of the limitation of liability for which provision is made in the aforesaid Carriage of Goods by Sea Act." And that: "No value of the goods mentioned in the amended libel was declared by the shipper and inserted in the bills of lading."

The Sixth defense alleges: "38. If the respondents are held liable for any loss or damage to or in connection with the transportation of the goods mentioned in the amended libel, they plead the benefit of each of the foregoing provisions (of paragraph r of the bill of lading), except the provisions for pro rata adjustment for partial loss or damage."

■ The respondent, the carrier, has the burden of proving by a fair preponderance of the evidence, the two special defenses for limitation of liability.

As to the tractors, respondent contends the carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier, and inserted in this bill of lading and extra freight paid if required, and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the carrier's liability, if any, shall not exceed the declared value, and any partial loss or damage shall be adjusted pro rata on the basis of such declared value. In no case shall the carrier be liable for more than the amount of damage actually sustained. The carrier shall not be liable, in any event for loss or damage to, or in connection with the goods if the nature or value thereof has knowingly and fraudulently been misstated by the shipper in the bill of lading."

1. "(5) Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

2. "r. Valuation. All claims for loss, damage or delay for which the carrier may be liable, shall be adjusted on the basis of the net unit invoice price of the goods at point of shipment, as the actual value of the goods. In case of any loss or damage to, or in connection with, goods exceeding in actual value $500 lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, on which basis the freight is adjusted and

that its liability should be limited to $500 for each tractor. Libelant argues that respondent's limitation of liability should be fixed at $500 for each measurement ton (40 cubic feet of space) occupied by each tractor. This was the freight unit on which the freight charges were calculated. Libelant contends also that it was the "customary freight unit" applicable to tractors which are shipped as is, uncrated and uncased.

The rock crusher was shipped "knocked down", in 21 items. Of these, there were 11 items crated; 4 items were cases; 1 item was an uncrated and uncased piece of machinery; and 5 of the pieces of machinery were on separate skids. A skid ordinarily is a frame or base of timber used as a support, like a heavy wooden sleigh. The piece of machinery is attached to the skid by bolts or steel wire. Rollers can be put under the skid to move it to its position in the hold of a ship. A skid also serves to protect the machinery from damage. Photographs of the five pieces of the rock crusher machinery on skids, taken at the dock at Honolulu, are exhibits 16A to 16-I inclusive.

As to the 21 items of rock crusher parts which are described in the bill of lading respondent contends that its maximum liability is $500 per crate, case, skid or piece, under both the bill of lading and the Carriage of Goods by Sea Act. Libelant does not seriously challenge that contention, as to the crates and cases, but does argue that as to machinery attached to skids or shipped simply as a piece the $500 limitation should be based on the "customary freight unit", because an uncrated and uncased piece of machinery or a piece of machinery on skids is not a "package".

Some skids are placed beneath the bottom of a container, which may be a case (Ex. 16, p. 109) or a crate (Ex. 13, p. 72). A piece of machinery, in addition to being securely bolted to skids may be "blocked to prevent undue strain on the skid bolts (Ex. 13, p. 166)". A plain skid generally consists of several long parallel pieces of heavy timber, with transverse pieces to hold them in position, such as figures 184 and 196 at pages 337 and 339 of Exhibit 14. The

skids to which parts of the rock crusher were attached are clearly shown on the photographs, Exhibits 16A to 16-I. The skids, for Items 1, 2 and 3 of the bill of lading, were plain bases consisting of two long squared timbers, placed parallel to each other, to which the pieces of machinery were bolted. There do not appear to have been any transverse timbers joining the parallel pieces. The skids for the two main shafts with mantel, items 4 and 14 of the bill of lading, consisted of two long squared timbers, placed parallel to each other, across which were three shorter transverse pieces, on which the round shafts rested in a groove, and to which the shafts were attached by wire cables. The shafts were protected by wooden 2/4s at the place where the wire cables encircled the shaft. Does the fact that a large piece of machinery is shipped on a skid, not cased or crated, put it in the class of "packages" under the provisions of the Carriage of Goods by Sea Act and of paragraph r of the bill of lading? I believe that it does and that the five pieces of machinery on skids in the case at bar should be classed as five "packages".

Respondent's contention is based on an interpretation of the words "customary freight unit" which would give the words "freight unit" the same meaning as a piece of freight or an item of freight, so that "customary freight unit" would mean the unit in which that type of cargo is customarily shipped. On the other hand, libelant's contention is based on an interpretation of the words "customary freight unit" which would give to the words "freight unit" the same meaning as a unit for freight charges, so that "customary freight unit" would mean the unit customarily employed in calculating the freight on that type of cargo.

In the case at bar there appears on the printed form of the bill of lading for the tractors (Ex. 2) a column headed "Quantity or number of pieces or packages" under which the number "11" is typed. There is another column entitled "Description of Goods" under which the words "TD-9 Tractors" are typed. In a column headed "Gross weight in pounds" appear the type-

written figures 126,500. In another column headed "Measurement" appear the typed figures 3,762. In a column headed "Rate", "18.25 per 40 c f." are typed. In the last column "Steamship Freight" appears 1,-716.41, indicating that there were 94.05 freight units of 40 cubic feet each in the total measurement of the eleven tractors. Each tractor occupied 342 cubic feet of space. There is also typed on the bill of lading the following "Heavy lift—11 units —each 11,500# @ 7.5-/2000", representing the heavy lift charge of 474.43 (par. g. of the bill of lading). To that was added "3% F.T.T. 65.73".

In the bill of lading the tractors are referred to as "pieces or packages" and as "units". Admittedly they were uncased and uncrated, and were shipped without any covering whatsoever. But even if the words "pieces" and "units" did not appear in the bill of lading and if only the printed word "packages" appeared, I would not hold that the use of the printed word "package" at the top of a column would make the uncased and uncrated tractor a "package" in fact. An uncrated tractor should not be considered as if it were described as crated.[3] I do not believe that the use of the printed word "package" on this bill of lading should be construed as a "stipulation" of the parties that the tractors were packages under the Act. Any attempt by the carrier to modify the limitation provisions of the Carriage of Goods by Sea Act through a printed provision of a bill of lading should be carefully scrutinized by the courts. Pan-Am. Trade v. The Campfire, 2 Cir., 156 F.2d 603. I have concluded that the limitation of liability as to each tractor is $4,270. [8.54 (freight units of 40 cu. ft. each) multiplied by 500 (dollars).]

The bill of lading for the rock crusher (Ex. 3) had a column with a printed heading: "Quantity or number of pieces or packages" in which appeared the typewritten numbers from 1 to 21 opposite their respective items. Under a column with the printed heading "Description of Goods" there appeared a description of the 21 items, which constituted the crusher "knocked down" and its spare parts. Each item was referred to as a skid, or a crate, or a case, or a piece, and the machinery and parts contained in the case or crate or on the skid were also briefly described. Other columns of the bill of lading had printed headings: "Gross Weight in Pounds"; "Measurement"; "Rate"; "Steamship Freight". [In two of the columns were listed in typewriting the weight and measurement of each of the 21 items.] In the last two columns, referring to rate and steamship freight, were typed the words "see attached sheet".

The "attached sheet" showed in detail how the freight was calculated. It was a typewritten sheet. To the left of the sheet under a column headed "Case No.", appeared the number of each of the 21 items. To the right under a heading "Freight Basis" appeared two sub-headings: "Weight" and "Measurement". If the freight of an item was based upon weight, the weight of the item in pounds was listed, if the freight was based upon measurement, the measurement of the item in cubic feet was listed. The total weight of the "cases" on which the freight was calculated on a weight basis was 188,906 pounds. The total measurement in cubic feet of the "cases" (Nos. 3, 7, 8, 9, 13, 18, 19 and 21) on which the freight was calculated on a measurement basis was 845 cubic feet.

The freight charges were:

188,906# (pounds) @ 18.25/2000 $1,723.77
845 c. f. @ 18.25/40 385.53

To that were added sums for "Heavy Lift penalties" on "Case # 1, 2, 3, 4, 6, 8 and 14", which brought the total of the charges to $3,441.02. On that sum there was a "3% Fed. Transf. Tax" 103.23. There were also "Advance chgs.—Wharf Tolls 46.23". The grand total was $3,590.48.

The attached sheet on which the freight was calculated in using the words "Case No." as to every item, is inconsistent with

---

3. The case of Eyles v. United Fruit Co. is to the contrary; so is The Margaret Lykes, D.C. La.1944, 57 F.Supp. 466.

the "description of goods" typed on the face of the bill of lading, where items Nos. 1, 2, 3, 4 and 14 are referred to as skids, and items Nos. 5, 7, 10, 11, 12, 13, 15, 16, 17, 20 and 21 are referred to as crates, and item 6 is referred to as a piece.

 As to the rock crusher, I have concluded that all the items, except item No. 6 ("1 pc. Spider w/Cap & Rings") are to be considered as "packages" under the limitation provisions of the Carriage of Goods by Sea Act. [T. 46 U.S.C.A. § 1304(5)] and that the limitation of liability is $500 as to each of the items except No. 6. The limitation of liability as to item No. 6 is $8,027.50 [16 and 11/200 (tons) multiplied by 500 (dollars).]

In an English case involving a shipment of unboxed automobiles, Mr. Justice Goddard of the Kings' Bench Division held that each automobile was not a package under the provisions of the Harter Act, 46 U.S.C.A. § 190 et seq., fixing $250 as the limitation of liability for "each package" unless a higher value was declared; that the word package "must indicate something packed"; that he could not hold that a "motor car put on a ship without a box, crate or any form of covering is a package, without doing violence to the English language". Studebaker Distributors, Ltd. v.

Charlton Steam Shipping Co. Ltd., Lloyds List Law Reports (1937) Vol. 59 at p. 27.

In his opinion in the Studebaker case Mr. Justice Goddard referred to an earlier English case [Whaite v. The Lancashire and Yorkshire Railway Company, L. R. 9 Ex. 467] decided in 1875, in which it was held that, under the Carriers Act, 11 Geo. 4 & 1 Wm. 4, o. 68 s. 1, limiting a carrier's liability to 10 for any article "contained in any parcel or package" unless a higher value was declared, a wagon with wooden sides but without a top, together with its contents (oil paintings), was a "parcel or package" under the language of the Carriers Act.[4]

On the appeal in the Whaite case, Bramwell, B. stated his opinion in the following paragraph:—"Bramwell, B. I think this waggon with its contents was a 'package' within the meaning of the Act. Although one would not commonly describe it in that way, yet, looking at the object and purpose of the Act, I think we are not only entitled, but compelled to say that it was a 'package or parcel' within the section. It is to be observed that the plaintiff himself and his foreman authorize us in so describing it, for they say they 'packed' the goods in the waggon, and no one would doubt that this expression was rightly used; but if so, then the waggon so packed

4. The facts of the Whaite case are reported as follows: "The cause was tried before Pollock, B., at Manchester, on the 23rd of December, 1873, and the facts proved were as follows:—The plaintiff, who was a decorator and exhibitor of fancy articles at Manchester, had sent to Wigan various articles, including decorations, models, mechanical figures, and oil paintings, for exhibition at the Wigan Infirmary Bazaar. On the closing of the exhibition these articles were packed in a waggon and a lorry for return. The oil paintings, which were ten in number, were placed in the waggon, the two middle ones being placed, with their faces inward, against the opposite sides of a frame shapped like an inverted V, and the remainder ranged in line behind the two first, and separated from each other and kept in place by strips of wood nailed to the floor. The waggon was open at the top, so that it could be seen that there were pictures inside, but the char-

acter of the pictures could not be seen. The plaintiff and his foreman, in their evidence, described themselves as having 'packed' the things in the waggon in this manner. The waggon and lorry were placed on two trucks on the defendants' line for conveyance to Manchester; the train in which they were met with a collision, and the contents of the waggon were greatly injured, the paintings in question, which were proved to be worth 100£, being wholly destroyed. The plaintiffs paid a sum of 31£ into court in respect of the other goods; a further sum of 20£ for consequential damage in respect of them was agreed on at the trial; and a verdict was entered for the plaintiff for 120£, with leave for the defendant to move to reduce the verdict to 20£, on the ground that as to the paintings the defendants were protected from liability by the Carriers Act (1), no declaration having been made or insurance paid."

with goods was a package. Further, the packed waggon had this quality of a package about it, that the pictures were so packed by the plaintiff that, though the defendants could see that there were pictures in the waggon, they could not see what was the exact character of the pictures, which the plaintiff's mode of packing concealed. The rule must, therefore, be made absolute to reduce the verdict to 20£."

Cleasby, B., observed: "It would be absurd to say that the waggon was too large to be a package, plainly, size cannot be a criterion".

Pollock, B., expressed the same opinion as his associates and stated: "The Act uses the words 'parcel' and 'package'. Both words being used, this gives us some assistance in arriving at the meaning of what each signifies. I think that this was a package, if not a parcel".

The history of the United States Carriage of Goods by Sea Act of 1936 is set forth by Judge Chesnut in his opinion in the case of The Bill, D.C., 55 F.Supp. 780, at page 782.[5] He also analyzes and explains the terms "customary freight unit" as follows:

"The next question that occurs, and it is the controlling one here, is whether the word 'freight' in this context means money or consideration to be paid to the carrier for the transportation of the commodity, or does it refer to the commodity itself. The respondent contends for the former meaning and the libelant for the latter. This latter contention would give to the phrase 'freight unit' the meaning of 'freighting unit' or 'shipping unit'. And in this case the libelant contends that the 'shipping unit' was one kilogram (worth about 50 cents) and not 1,000 kilograms as stated in the bill of lading in calculation of the freight rate. In other words, the libelant says that customary 'freight unit' does not mean the 'rate of freight' to be charged.

"Upon consideration of this hitherto unadjudicated point, I conclude that the phrase 'per customary freight unit' in this context in the light of its legislative history, refers to the unit of quantity, weight or measurement of the cargo customarily used as the basis for the calculation of the freight rate to be charged. Generally, in marine contracts the word 'freight' is

5. "The history of the U. S. Carriage of Goods by Sea Act of 1936 is a very interesting one in the field of admiralty law. It was finally passed by Congress to promote uniformity in ocean bills of lading. For many years prior thereto efforts had been made in this and other countries to achieve such uniformity. The history of this can be found in Knauth on Ocean Bills of Lading, (1937) 99–110. In 1924 certain rules (the Hague rules) were adopted by an international convention for the unification of certain rules relating to 'Ocean Bills of Lading'. In them (Art. 4, s. 5) the parallel limitation of liability clause read: 'In an amount exceeding 100 pounds sterling *per package or unit.*' These Hague rules have subsequently been adopted in a number of other countries including Great Britain (1925) and the United States (1936). The phraseology of the British statute followed the Hague rules with respect to the wording of the limitation clause. But it will be noted that in the United States Act the phrase 'per unit' has been expanded or changed to read 'per customary freight unit'. There was considerable delay (1923–1936) before this coun-

try passed its Act. In the intervening years several successive Bills were introduced in which the phraseology of the limitation clause at times read '$100 per package or unit'; '$500 per package or unit'; '$500 per package or, in case of goods not shipped in packages, per customary freight unit.' Various hearings were held on these several Bills over this period of years. During these hearings, or some of them, other varying phraseology was suggested from time to time by interested parties including among other phrases 'per declared freight unit'. The final Bill which was subsequently passed was introduced on January 17, 1935 in the Senate (S. 1152) containing the phraseology '$500 per package, lawful money of the United States, or in case of goods not shipped in packages, *per customary freight unit*'. (Italics supplied.) There appear to be no committee reports which clearly explain the quoted phrase 'per customary freight unit'; but it seems reasonably clear that the phraseology finally adopted was intended to be more definite than the shorter phrase 'per unit' contained in the Hague Rules."

used to denote remuneration or reward for carriage of goods by ship, rather than the goods themselves. Benedict on Admiralty, Vol. I, 6th Ed., § 92, p. 284; Carver on Carriage of Goods by Sea, 8th Ed., § 543, p. 755; Richards on Insurance, 4th Ed., § 424, p. 765. Furthermore, in this case the respondent has submitted the deposition evidence given by a competent witness experienced in the trade who used the phrase 'freight rate' and 'freight unit' synonymously. The witness also stated in effect that 1,000 kilos of oil did constitute the 'customary freight unit'. This evidence is un-contradicted.[2]"

In the case of Stirnimann v. The San Diego, 2 Cir., 1945, 148 F.2d 141, 143, the shipment consisted of the parts of a giant amusement crane (knocked down) shipped from Le Havre, France, to San Francisco, California. The clean bill of lading "acknowledged receipt at Le Havre of '126 colis', or component parts of the crane 'all in apparent good order and condition'." On delivery at San Francisco 22 of the units comprising the shipment, including steel cables, were receipted for as bent, dented and kinked. The issue presented was the application of the limitation of liability provisions of the Carriage of Goods by Sea Act. The respondent's attorney in the District Court claimed that the entire amusement crane (although shipped in 126 pieces) constituted a single freight unit and that the limitation of liability was only $500 for the entire shipment, because a lump sum freight had been charged, 56,000 francs; that it was not a freight per ton or a freight of so many cubic feet, but a freight of 56,000 francs for one unit, the amusement crane. The libelant in that case argued that each piece of the crane constituted a freight unit and that the liability limitation was $500 per piece. The

total weight of the entire shipment was 38,960 kilograms.

Judge Clark, writing the opinion for the Second Circuit, stated:

"Respondents further contend that under the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(5), libelant is limited to a recovery of $500. That statute limits the carrier's liability for goods, the value of which has not been declared, to $500 per package, 'or in case of goods not shipped in packages, per customary freight unit.' Here the crane was hardly to be regarded as shipped in packages. But certainly it was not shipped as a unit, and on the face of the record it surely is not to be taken as a single customary freight unit. Respondents contend, however, that the freight charge was conceded at trial to be a lump sum, and cite the case of Brazil Oiticica, Ltd., v. The Bill, D.C.Md., 55 F. Supp. 780, in support of the proposition that when freight is so charged, libelant is limited to a recovery of $500. But all that was conceded at trial was that the freight was a lump sum on the bill of lading. It does not appear how the figure on the bill was arrived at. The record shows that each piece was carefully weighed and measured, and described in a schedule attached to the bill of lading. It seems reasonable to suppose that the weight and size of each piece were carefully and separately considered in arriving at the freight.

"Moreover, Brazil Oiticica v. The Bill, supra, does not support respondents' contention. There it was proved that in shipments of oil in bulk in the 'two deep tanks' of the ship the 'customary freight unit' was 1,000 kilos, and so the court applied the $500 limitation to each 1,000 kilos of the shipment. Significantly, the court did not hold that there was but a single unit,

2. "In this connection it may be of interest to note the wording of the Uniform North Atlantic Bill of Lading Clause, 1937. The 17th Art. (See Knauth, supra, p. 86) deals with the limitation of liability and reads in part: 'In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States per package, or, in case of goods not shipped in packages, the customary freight unit, the value of the goods shall be deemed to be $500 per package or per unit, *on which basis the freight is adjusted*', etc. (Italics supplied.)"

or even two units; and it cited this case below with apparent approval. Here there was not presented like proof as to the customary method of charging freight on, or shipping, giant cranes. Nor is it likely that any particular custom prevails. The court below held that each of the 126 pieces was a separate package or freight unit, each being subject separately to the $500 limitation. This is a reasonable conclusion where there is no showing of a contrary custom, in the light of the obvious purpose of the section—as has been said of the somewhat less precise English counterpart, cf. 55 F.Supp. 780, 782—to prevent 'excessive claims in respect of small packages of great value,' but not to permit carriers to escape liability for just claims. Temperley & Vaughan, Carriage of Goods by Sea Act, 1924, 4th Ed. 1932, 82; cf. Studebaker Distributors, Ltd., v. Charlton Steam Shipping Co., [1938] 1 K. B. 459, 467."

The District Court's opinion, 55 F.Supp. 798, 800, contained nothing to show whether any of the parts of the crane were cased or crated. But Judge Bright did state that "The several unpacked and uncrated parts of the crane were damaged". As to limitation of liability he wrote: "In the absence of any testimony as to the rate applied to this shipment, or the manner in which the amount of the freight was arrived at, the words 'freight unit', in my opinion, refer not to the entire shipment which was in 126 units or parts, but to tons or separate pieces. The contention of the respondent in this respect is, therefore, overruled, and the libelant may recover its damage, reasonably to be ascertained, but not in excess of $500 as to any separate part scheduled in the bill of lading."

The case of Waterman S. S. Corp. v. U. S. Smelting Refining & Mining Co., 5 Cir., 155 F.2d 687 involved the loss of 13 pieces of structural steel, stowed on deck on the S. S. West Kyska, bound from Baltimore to Seattle. The opinion of the appellate court lists five contentions made by the carrier, of which the Fifth reads as follows, 155 F.2d page 689:

" 'V—In the event appellant should be held liable, appellee's recovery should be limited to $500 per piece or package lost but in no event may it exceed the arrived sound market value.'

"The parties stipulated that the thirteen plates of steel lost were in good order and condition on delivery to the carrier in Baltimore. The parties agree that the carrier was a common carrier of these goods.

"The straight bill of lading covering the steel lost provided:

"(1) That 771 tons of a total shipment of 1052 tons were loaded on deck.

"(2) That goods carried on deck were at 'owner's risk.'

"(3) That the terms 'owner's risk' meant that the carrier should not be liable for loss or damages 'unless shown to have resulted from some negligence or default of carrier against liability for which it is precluded by law from contracting.'

"(4) An incorporation of the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., Apr. 16, 1936, Chap. 229, 49 Stat. 1207 et seq.

"(5) That all risks of loss or damage by perils incident to carriage of goods on deck should be borne by cargo owner, and the provisions of the Carriage of Goods by Sea Act notwithstanding § 1(c) thereof should govern the custody and carriage of such goods.

"The 771 tons of deck stow was divided into several piles, each approximately 8 feet high. The steel lost overboard was stowed on a pile to the port side between hatch No. 1 and the rail."

In discussing the issue of limitation of liability the court stated:

"The bill of lading here contains no statement as to the value of the merchandise. The carrier argues that since thirteen pieces of steel were lost, the recovery should be limited to $6500, thirteen multiplied by $500. Therefore, we must interpret the statutory term, 'customary freight unit.' The steel was not in packages and the bill of lading provides for a tariff rate of 64¢ per 100 pounds. Therefore, the limitation of the Carriage of Goods by Sea Act does not apply since $500 multiplied by each 100 pounds of steel lost would produce a sum far great-

496

er than the damages allowed. [The damage allowed was $8,064.18.]

"Our interpretation of the statute is based upon the clear reasoning set out in The Bill * * *. [D.C., 55 F.Supp. 780 at page 783, affirmed Lorentzen v. Brazil Oiticica, Inc., 4 Cir., 1944, 145 F.2d 470.] * * *

"A witness for the shipper testified that the replacement value of the thirteen sheets of steel was $8,064.18. The shipper's witness testified that the replacement value represented the value of the steel plates at Seattle. No other evidence in the record exists as to the value of the steel lost overboard."

Certiorari was denied by the United States Supreme Court in the West Kyska case, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656, but the limitation of liability question was not included in the questions on which the petitioner (the carrier) sought a review.

In The Bill, D.C., 55 F.Supp. 780, 783, Judge Chesnut received testimony of competent witnesses experienced in the trade who used the phrase "freight rate" and "freight unit" synonymously. The witness also stated in effect that 1000 kilos of oil did constitute the "customary freight unit".

In the case at bar the "freight rate" was based on the "customary freight unit", which was established at the time to be a weight ton of 2000 pounds or a measurement ton of 40 cubic feet, whichever would yield the greater return to the carrier. Experts testified that this was the customary freight unit for machinery shipped from Honolulu, T. H. It was the freight unit shown in the published tariffs of the respondent (Ex. 4) and in the tariffs of other carriers. A measurement ton or a weight ton is also shown as the freight unit in the Schedule of Rate and Tariff Rules (Number 39) of the North Atlantic U. K. Freight Conference (agreement No. 7100) effective May 17, 1946. See page M of Ex. A.

In the valuation clause of the bill of lading in the case at bar, which contains a limitation of liability based on the Carriage of Goods by Sea Act, the following clauses are used interchangeably: "$500

per package or per unit, on which basis the freight is adjusted" and "500 per package or per customary freight unit". It appears that the respondent itself by the language of its bill of lading has given the same interpretation to the phrase "per customary freight unit" as that ascribed to it by libelant's counsel.

I am filing herewith findings of fact and conclusions of law. The libelant will be entitled to recover the amount of their actual damage as to each item, but not in excess of the limitation of liability calculated as herein indicated. The amount of the actual damage will be determined by a Special Commissioner. Submit an interlocutory decree.