Petition of ISBRANDTSEN COMPANY, Inc.

**ISBRANDTSEN CO., Inc. v. UNITED STATES.**

The EDMUND FANNING.

No. 109, Docket 22503.

United States Court of Appeals Second Circuit.

Argued Dec. 11, 1952.

Decided Jan. 15, 1953.

Lord, Day & Lord, New York City, Thomas F. Daly and Henry C. Blackiston, Jr., New York City, Advocates for Isbrandtsen Co., Inc., petitioner-appellant.

Myles J. Lane, U. S. Atty., New York City, Edward L. Smith, Erwin W. Rossuck and Walter L. Hopkins, Attys. Department of Justice, New York City, Advocates, for United States, appellee.

Before AUGUSTUS N. HAND, CLARK and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

In September 1947 Isbrandtsen Company, Inc., a domestic corporation organized under the laws of the State of New York (hereinafter called Isbrandtsen) filed a petition in the United States District Court for the Southern District of New York seeking exoneration under the Fire Statute, 46 U.S.C.A. § 182, from liability for a fire on board the Liberty Vessel S. S. Edmund Fanning, which Isbrandtsen had chartered from its owner, the United States. The petition also asked that if Isbrandtsen should be adjudged liable its liability be limited to the value of its interest in the vessel after the fire in accordance with the Limitation Statute, 46 U.S.C.A. § 183. The district court awarded an interlocutory decree adjudging that the United States recover from Isbrandtsen the full amount of the damages sustained by it through the loss of ten locomotives and tenders as a result of the fire. All other claims filed in the proceeding were settled and withdrawn or were dismissed at the conclusion of the trial.

The ten locomotives and tenders were loaded by the United States Army on The Fanning at Bremen, Germany, for shipment to Korea. Additional cargo, including sulphuric acid, chlorate of potash and sodium peroxide, was later taken on board. The fire occurred while the ship was in port at Genoa, Italy, resulting in the total loss of the ship and damage to the cargo in suit. The trial judge held that the fire resulted from the negligent stowing of the sulphuric acid over the above-mentioned chemicals, finding that the acid corroded the metal drums in which it was stored and leaked down upon the other chemicals, producing a fire and explosion. Isbrandtsen's responsibility for the negligent stowage was held to be established because of the acts of its agent, Captain Praast, who was authorized to, and in fact did, supervise the loading of the cargo. Consequently the Fire Statute, 46 U.S.C.A. § 182, and the Limitation Statute, 46 U.S.C.A. § 183, were held inapplicable.

The parties agreed that the shipment was covered by the government form of bill of lading. By its terms this form was "subject to the same rules and conditions as govern commercial shipments made on the usual forms provided therefor by the carrier." Hence, the trial court concluded that the government form, as modified by the provisions of the usual Isbrandtsen form, established the conditions under which the shipment was made. The latter bill of lading contained language limiting liability, which is set forth below.[1] It also incor-

---

1. "17. In case of any loss or damage to or in connection with goods exceeding in actual value $500 lawful money of the United States, per package, or, in case of goods not shipped in packages, per customary freight unit, the value of the goods shall be deemed to be $500 per

package or per unit, on which basis the freight is adjusted and the Carrier's liability, if any, shall be determined on the basis of a value of $500 per package or per customary freight unit, or pro rata in case of partial loss or damage, unless the nature of the goods and a valuation

284

porated the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq., which, in so far as here relevant, are to the same effect as those in the Isbrandtsen form, 46 U.S.C.A. § 1304(5).

 Isbrandtsen contends that the government failed to show that the fire was caused by Isbrandtsen's negligence. We think the trial judge was right in holding as he did that, in order to deprive Isbrandtsen of exoneration from liability under the Fire Statute, 46 U.S.C.A. § 182, the United States had the burden of showing that the stowage was improper due to the negligence of Isbrandtsen and that the negligent stowage caused the fire. We also think that he did not err in holding that the government had met this burden. There can be no doubt that the stowage of the acid was such that a fire would result if there was leakage upon the chemicals stored below. The evidence showed that sulphuric acid has a tendency to corrode metal drums. Isbrandtsen argues that, if the drums had been lined with glass or porcelain, corrosion would not have occurred. This, however, was a matter of defense since the evidence was under the control of Isbrandtsen and in the absence of a showing to the contrary the lack of such a lining may fairly be found. Cf. The Eastchester, 2 Cir., 20 F.2d 357, 358. Captain Praast, Isbrandtsen's employee, testified on cross-examination that if the drums were to leak the liquid would come into contact with the chlorate of potash stowed beneath. The chlorate of potash was described in the bill of lading as contained in "barrels" or "kegs." The words "barrels" and "kegs" strongly suggest a wooden composition. Moreover, evidence of what they were composed of again was controlled by Isbrandtsen and the trial court, in the absence of evidence to the contrary, was justified in concluding that they were made of wood. Hence, Isbrandtsen's contention

that it was not shown that the leaking acid would come in contact with the chlorate of potash is unfounded.

Isbrandtsen further argues that, since the evidence showed that a mixture of the acid and potassium chlorate would result in an explosion, and smoke was observed before the rumblings and explosion were heard, the fire was not caused by such a mixture. But there could well have been smaller explosions at first which, taking place at the bottom of the hold, were inaudible and hence the ignition of the potassium chlorate before the explosion was heard was not improbable. That the fire might have resulted from a mixture of the leaking acid with the sodium peroxide was also adequately proved. In the light of the evidence of constant vigilance to prevent smoking in the hold Isbrandtsen's contention that the fire resulted from a smouldering cigarette seems implausible. The court below did not believe this and there was no evidence to support the theory that smoking occurred in the hold where the fire started while the ship was at Genoa. In view of the undeniably dangerous situation created by the negligent stowage and the fact that a fire did result, we agree with the trial court that the government sufficiently met its burden of showing that Isbrandtsen's negligence caused the fire. All of the circumstances were proved, see Chicago, M. & St. P. Ry. v. Coogan, 271 U.S. 472, 477, 46 S.Ct. 564, 70 L.Ed. 1041, and it was not unreasonable to hold that fire, danger of which was clearly shown to have existed, did in fact eventuate.

The trial judge held that the Carriage of Goods by Sea Act could not validly be incorporated into the bill of lading covering the locomotives, and that the further provision in the bill of lading limiting liability to an agreed sum, which is identical in so far as here relevant with the effect of incorporating the Carriage of Goods by Sea Act, was contrary to public policy. But

higher than $500 shall have been declared in writing by the shipper upon delivery to the Carrier and inserted in this bill of lading and extra freight paid if required and in such case if the actual value of the goods per package or per customary freight unit shall exceed such declared value, the value shall nevertheless be deemed to be the declared value and the Carrier's liability, if any, shall not exceed the declared value and any partial loss or damage shall be adjusted pro rata on the basis of such declared value."

clauses so limiting liability have been held not contrary to the public policy preventing carriers from exonerating themselves from liability for negligence when an opportunity to pay a higher rate and secure a higher valuation has been afforded. Hart v. Pennsylvania R. R. Co., 112 U.S. 331, 340–341, 5 S.Ct. 151, 28 L.Ed. 717; Kansas City Southern Ry. Co. v. Carl, 227 U.S. 639, 33 S.Ct. 391, 57 L.Ed. 683; E. Gerli & Co., Inc., v. Cunard S.S. Co., Ltd., 2 Cir., 48 F.2d 115; see The Ansaldo San Giorgio I. v. Rheinstrom Bros. Co., 294 U.S. 494, 497, 55 S.Ct. 483, 79 L.Ed. 1016; The Cayo Mambi, 2 Cir., 62 F.2d 791. Such a contract, enabling a carrier to adjust its rates so as to be commensurate with the risk assumed, is unlike the contracts exonerating a carrier from liability which courts have struck down. E. g., United States v. Farr Sugar Corp., 2 Cir., 191 F.2d 370, affirmed United States v. Atlantic Mutual Ins. Co., 343 U.S. 236, 72 S.Ct. 666. We see no reason why the limitation clause as incorporated from the Carriage of Goods by Sea Act and as set forth in the bill of lading itself is not valid if the government in fact could have secured a higher valuation on paying a greater freight.

■■ The Carriage of Goods by Sea Act is applicable to shipments in foreign trade to and from ports of the United States, but not to shipments such as the locomotives here between foreign ports or to coastal shipping between two United States ports, 46 U.S.C.A. § 1300. Permission has been granted to subject contracts for shipments between United States ports to the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1312. But Congressional silence as to incorporation of the Act in bills of lading covering trade between two foreign ports is not such a declaration of policy as to overcome the long standing rule that such agreed value provisions, the only provision here in issue incorporated from the Act, are valid. Moreover, any policy against the use of such clauses is difficult to find, since they are expressly allowed as to situations covered by the Act, although with a minimum valuation of $500 required.

■■ The government further urges that no opportunity of securing a higher valuation was afforded it. See Union Pacific R. R. v. Burke, 255 U.S. 317, 41 S.Ct. 283, 65 L.Ed. 656. The clause in the Isbrandtsen bill of lading expressly provides that the shipper may avoid the limitation by declaring in writing the nature of the goods and a higher valuation, paying extra freight. Such a provision is prima facie evidence of what it recites. Hart v. Pennsylvania R. R. Co., 112 U.S. 331, 337, 5 S.Ct. 151, 28 L.Ed. 717. The government was at liberty to show the falsity of the recital, Transmarine Corp. v. Charles H. Levitt & Co., 2 Cir., 25 F.2d 275; see Frederick Leyland & Co. v. Hornblower, 1 Cir., 256 F. 289, 294, but we do not think that it did so. The evidence showed that no published tariff was applicable to locomotives of the size and weight of those involved here, and that each contract was separately negotiated. There is no showing that in the negotiation of the contract a higher valuation could not have been secured upon payment of a higher freight charge. Nor does the fact that the value agreed upon was only a fraction of the actual value of the locomotives invalidate the clause. Pierce Co. v. Wells, Fargo & Co., 236 U.S. 278, 285, 35 S.Ct. 351, 59 L.Ed. 576; see Frederick Leyland & Co. v. Hornblower, 1 Cir., 256 F. 289, 293–294. So long as a higher valuation could have been secured and there was no fraud on the part of the carrier, the provision is not unreasonable or unconscionable. The government's contention that the negligent stowage of the chemicals with the locomotives constituted a conversion of the latter would stretch the meaning of conversion to a degree that is unwarranted.

■ The government asserts that since its bill of lading, the basic shipping document, provided: "the shipment is made at the restricted or limited valuation specified in the tariff or classification at or under which the lowest rate is available," and there was in existence no tariff or classification providing for any limitation, that there was no limited valuation clause applicable. Consequently, it argues, the two clauses in the Isbrandtsen bill of lading providing for a $500 limitation, being inconsistent with the basic government bill,

are not imported into the contract of carriage. In answer to this Isbrandtsen rightly argues that "it is immaterial that there is no formal printed or published tariff. The significant thing is that the government, in order to be certain of obtaining the lowest rate available, makes it clear that the cargo shall move on the limited valuation basis only." Having secured the lower rate sought, the government is bound by the clause limiting the carrier's liability.

■ The argument is made that the Isbrandtsen bill of lading was not its "usual form" within the meaning of the clause in the government bill of lading providing for the incorporation of "the usual form" of the carrier. But it was undoubtedly shown to be the usual form which Isbrandtsen employed for its shipping throughout the world. We agree with Judge Ryan that such a form is properly to be termed a "usual form." The fact that this was the first time that Isbrandtsen had carried goods between these particular ports does not preclude it from having a usual bill of lading.

■ The $500 limitation of liability applies "per package" or "per customary freight unit," if shipment is not made in packages. It would seem that an uncrated locomotive is not a "package." Middle East Agency v. The John B. Waterman, D.C.S.D.N.Y., 86 F.Supp. 487; Studebaker Distributors Ltd. v. Charlton Steam Shipping Co., 59 Lloyds List L.Rep. 23, 27. The authorities have construed the words "customary freight unit" to refer to the unit upon which the charge for freight is computed and not to the shipping unit. Waterman S.S. Corp. v. U. S. Smelting, Refining & Mining Co., 5 Cir., 155 F.2d 687; The Bill, D.C.D.Md., 55 F.Supp. 780, affirmed, 4 Cir., 145 F.2d 470; Middle East Agency v. The John B. Waterman, supra; cf. Stirnimann v. The San Diego, 2 Cir., 148 F.2d 141. But such a construction avails the government nothing here, for the shipping unit and the unit for computing the freight charge were the same—a locomotive and tender. The evidence clearly shows that the rate was calculated at $10,000 per unit of locomotive and tender.

This interpretation may lead to a strange result, for freight on small locomotives under twenty-five tons is computed per ton and consequently would involve a larger liability than is imposed for the more expensive locomotives involved here. But the language of the limitation is controlling and applies to the locomotives and tenders here by its express terms. Our conclusion accordingly is that Isbrandtsen's liability is limited to $500 per unit of locomotive and tender, or $5,000 in all.

■ The United States further argues that there were deviations which nullified the limitations contained in the bill of lading. The first one claimed was the absence of a competent master for part of the voyage and the loading of cargo while unseaworthy in that respect. But the Captain was in fact on board and technically at least in supervision of the vessel. The fact that he was unwell and availed himself of the assistance of one of Isbrandtsen's agents to aid in the navigation and stowage of cargo was not in our opinion a deviation. It is also asserted that it was a deviation to stow the cargo negligently. But improper stowage has been held by Judge Goddard in the District Court for the Southern District of New York not to constitute a deviation, Lagerloef Trading Co. v. United States, D.C.S.D.N.Y., 43 F.2d 871, and a similar conclusion was indicated by the Fifth Circuit, The Chester Valley, 5 Cir., 110 F.2d 592, 594. The third claim of deviation is based on the contention that the ship would have to deviate to restow before passing through the Suez Canal. The ship never reached the Suez Canal because she was destroyed by fire. We can discover no basis for such a speculative claim of deviation as the foregoing. Moreover, it is entirely possible that the stowage would have been completely rectified before reaching the Suez Canal without deviating to restow.

For the foregoing reasons we hold that Isbrandtsen's liability is to be limited to $5,000, and the case is accordingly remanded with instructions to proceed in accordance with this opinion.

CLARK, Circuit Judge (concurring in the result).

I agree fully in the decision that the carrier is not exonerated from liability under the Fire Statute, but have much more doubt as to the limitation of its loss to $500 per locomotive. The opinion suggests, but does not fully develop, the gerry-built structure of reasoning necessary to find this limitation in a shipment initiated over the telephone and confirmed by brief letters, finally arrived at by a process of double incorporation by reference to the government bill of lading and thence—rejecting an unauthorized bill issued by the carrier's Bremen agent—to the Isbrandtsen bill itself. Various defenses to this limitation are suggested or raised; some of them, such as the unusual (to say the least) form of customary freight unit, cf. our discussion in Stirnimann v. The San Diego, 2 Cir., 148 F.2d 141, may well give pause. But I have decided to pass these to get to the point I regard as most crucial, namely, whether there was properly available a tariff at higher rate so that the shipper could secure a higher valuation to provide a legal basis for the limitation.

That there was no existing tariff of this nature on locomotives from Bremen to Korea is conceded by all; and Isbrandtsen's vice-president so testified. This telephonic agreement was an *ad hoc* bargain, made for a particular unusual shipment for which there was no regular tariff. The real question is whether the various clauses quoted in the text of the opinion placed on the shipper the burden of asking and securing an *ad hoc* quotation of a higher rate had it been interested. Does the limitation apply until the shipper shows that the carrier refused to bargain at all on any other basis? Or is it invalid unless the carrier shows that it had offered the shipper some definite alternative? When the original judicial restrictions on attempts at limitation of liability were developed, I do not believe there is much doubt but that the carrier would have had the laboring oar in a case like this. Union Pac. R. Co. v. Burke, 255 U.S. 317, 323, 41 S.Ct. 283, 65 L.Ed. 656; Transmarine Corp. v. Charles H. Levitt & Co., 2 Cir., 25 F.2d 275, 279.

And the recent case of United States v. Atlantic Mut. Ins. Co., 343 U.S. 236, 72 S.Ct. 666, affirming United States v. Farr Sugar Corp., 2 Cir., 191 F.2d 370, while not on all fours, shows that some vestiges of the older concepts still remain. But there is no doubt of the trend of legislation and of precedent to foster and support our merchant marine. Even though at times this has gone to unusual lengths, who, remembering our dependence on shipping in the World Wars, can dare question its wisdom? And so I have decided to yield to the judgment of my brothers and go along, albeit with some lingering doubts, in the view that this $100,000 in freight charges was collectible at a total risk of only $5,000.