WATERMAN STEAMSHIP
CORPORATION, Plaintiff,

v.

VIRGINIA CHEMICALS, INC., et
al, Defendants.

Civ. A. Nos. 81–0821–T, 82–0597–T
and 82–0598–T.

United States District Court,
S.D. Alabama, S.D.

Jan. 20, 1987.

James H. Frost & Joseph M. Allen, Jr., Mobile, Ala., for plaintiff.

Oliver J. Latour, Bay Minette, Ala., for defendants.

DANIEL HOLCOMBE THOMAS, Senior District Judge.

This Court sitting without a jury heard this matter from November 17, 1986, until November 20, 1986. After considering all the evidence, exhibits and documents submitted by both sides, the Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. The plaintiff, Waterman Steamship Corporation, is a corporation organized under the laws of the State of New York with a principal place of business in Mobile, Alabama.

2. At all material times the SS Jeff Davis was owned and operated by the plaintiff, Waterman Steamship Corporation (Waterman).

3. Defendant Insurance Company of the U.S.S.R. (Ingosstrakh) Ltd., is a corporation organized under the laws of the U.S.S.R. with the principal place of business in Moscow, U.S.S.R. Ingosstrakh furnished a

general average bond in this case in order to have cargo released from the lien asserted by Waterman as a result of the general average declaration made subsequent to the fire which is the center of this controversy.

4. Defendant V/O Sojuchimexport is a corporation organized under the laws of the U.S.S.R. with its principal place of business in Moscow, U.S.S.R.

5. This is a general average claim arising from a fire that started in a cargo of the hazardous chemical called sodium hydrosulfite on February 17, 1981. The sodium hydrosulfite cargo was stowed in the No. 6 lower hold of the SS Jeff Davis. When the fire started in the No. 6 hold, the SS Jeff Davis was in Canadian waters approximately 15 miles off Sept Isle in the St. Lawrence River. The vessel was on a voyage from New Orleans to Europe.

6. Sodium hydrosulfite is a white, free-flowing crystalline chemical which resembles table salt. It will decompose violently, resulting in fire, if water or moisture comes into contact with it. Sodium hydrosulfite is classified in the government's DOT regulations Hazardous Materials Table as a hazardous flamable solid that must be kept dry and stowed below deck in metal drums only. The Table also says that sodium hydrosulfite must be kept separate from flamable gases, liquids, oxidizing materials or organic peroxides (49 C.F.R. § 172.101, I.D. Number UN 1384).

7. The sodium hydrosulfite cargo was manufactured by Virginia Chemicals, Inc. at its plant in Bucks, Alabama, and was booked for shipment to the U.S.S.R. aboard the SS Jeff Davis.

8. Waterman knew at the time it agreed to transport this hazardous cargo of 917 drums of sodium hydrosulfite that it was a flammable solid which would catch on fire if it came in contact with water. Waterman also knew that the governmental regulations which apply to the handling and transport of a cargo of sodium hydrosulfite were set forth in 49 C.F.R. §§ 171–199.

9. The Court finds that the 917 metal drums of sodium hydrosulfite were well packaged by Virginia Chemicals, Inc. for proper handling. The metal drums were fitted with a polyethylene liner. The top of the bag was bunched up, folded down, secured with a rubber band, then a steel top with an attached gasket was put in place and secured by a ring which was tightened onto the drum with a bolt and nut. Each drum contained 250 pounds of sodium hydrosulfite and conformed with the specifications of a 37A drum as required by government regulations. [*See* 49 C.F.R. § 173.204(a)(4)].

10. The drums were properly labeled with a "FLAMMABLE SOLID" label; as well as an easily readable label which stated the name of the chemical, the molecular formula, and contained the following warning in bold print:

FLAMMABLE SOLID—IRRITANT. WILL GENERATE HEAT WHEN MOISTENED. KEEP AWAY FROM MOISTURE, HEAT, SPARKS AND OPEN FLAME. IF EYES OR SKIN ARE CONTACTED, WASH WITH LARGE AMOUNTS OF WATER.

The label also contained the warning: "If the drum is hot to touch or if material is smoking, bubbling, or burning, use acid vapor gas masks and gloves in handling—remove to ventilated area, dump contents and flush with large quantities of water." An emergency telephone number for Virginia Chemicals was listed as well as the emergency Chemtrec number. Numerous photographs were introduced at the trial which show clearly that the cargo was properly and adequately labeled.

11. The bills of lading by which the sodium hydrosulfite was shipped to Waterman's terminal contain the following notation: "FOR INSIDE STORAGE ONLY".

12. Southern Railway Company transported the 917 drums in question from the Bucks, Alabama, chemical plant on November 19–21, 1980, to Waterman's terminal in New Orleans.

13. On December 1 and 3, 1980, the 917 drums arrived in New Orleans. Ryan

Walsh Stevedoring Company, acting under orders from Waterman, discharged the barrels at Waterman's Poland Street Pier in New Orleans where the drums were palletized for shipment on the SS Jeff Davis.

14. Waterman's dock receipts show that 700 of the drums were stored under "open wharf" conditions which is a large uncovered parking lot type storage yard there at the dock. Waterman's New Orleans office learned of this outside storage either the day the drums were received or the following day.

15. The cargo remained on "open wharf" unprotected from its arrival in New Orleans on or about December 1–3, 1980, until it was loaded onboard the vessel almost four weeks later.

16. This Court finds that Waterman was negligent in storing the drums of sodium hydrosulfite outside; when they knew from the labels, bills of lading, and DOT regulations of hazardous materials, sodium hydrosulfite ignites when it comes in contact with water and moisture. Waterman knew the drums of sodium hydrosulfite were for inside storage only.

17. Nine Hundred fifteen (915) drums were loaded into the No. 6 lower hold of the SS Jeff Davis on December 26, 1980, and during the early morning hours of December 27, 1980. Two drums of the original shipment from Bucks, Alabama, were damaged prior to the rest of the drums being loaded onto the SS Jeff Davis.

18. There was no evidence at trial and no entry in the vessel's log book that Waterman complied with the requirements of 49 C.F.R. § 176.58 which requires as follows:

Each hold or compartment in which hazardous materials are to be transported must be swept clean of all debris before the hazardous materials are stowed therein. Bilges must be examined and all residue of previous cargo removed.

19. This Court finds that neither 49 C.F.R. § 176.30 § 176.39 nor § 176.57 were complied with when the SS Jeff Davis was being loaded in New Orleans. 49 C.F.R. § 176.57, subsection (a) provides:

Hazardous materials may be handled or stowed on board a vessel *only* under the direction and observation of a qualified person assigned for this duty.

Neither the Chief Mate nor Waterman's Port Captain who was responsible for the vessel's loading was aboard the vessel during the time that the hazardous cargo of sodium hydrosulfite was loaded.

Subsection (c) 49 C.F.R. § 176.57 provides that for a domestic vessel engaged in a foreign-going voyage, the person must be an officer possessing an unexpired license issued by the Coast Guard and assigned this duty by the carrier or master of the vessel.

49 C.F.R. § 176.39(a) dealing with manned vessels requires:

[e]ach hold or compartment containing hazardous materials be inspected after stowage is complete and at least once every 24 hours thereafter, weather permitting, in order to ensure that the cargo is in a safe condition and that no damage caused by shifting, spontaneous heating, leaking, sifting, wetting or other cause has been sustained by the vessel or its cargo since loading and stowage.... A vessel's hold equipped with smoke or fire detecting systems having an automatic monitoring capability need be inspected only after stowage is complete and after periods of heavy weather.

The regulation also requires that an entry be made in the vessel's deck log for each inspection of the stowage of hazardous material performed. The vessel's deck log contains no entry showing any inspections were made and, the testimony of the Port Captain in New Orleans, the Chief Mate, and the Port Captain in Montreal established that no inspection was ever performed either in New Orleans, on the way to Canada, or during the loading operation in Canada.

20. The palletized drums of sodium hydrosulfite were stowed skin to skin, forward in the No. 6 lower hold. Aft of the sodium hydrosulfite was a cargo of palle-

tized polyken pipeline protective outwrap tape stowed skin to skin also. Numerous photographs were introduced into evidence which corroborate the testimony that it was virtually impossible to see the cargo of sodium hydrosulfite after the tape was loaded.

21. After the New Orleans cargo was stowed in the No. 6 lower hold, carpenters employed by the stevedores shored up the stow. The stow was thereafter inspected by representatives of Ryan-Walsh.

22. The stow was also inspected by Captain Walter Pointon, the master of the Jeff Davis, who testified that he went into the No. 6 lower hold in New Orleans to discuss the manner of shoring of the cargo, inspect the stow, and give his approval for using wire cable attached to the vessel as a part of the shoring.

23. Storing the cargo outside on an "open wharf" for close to a month, plus the prior mentioned statutory violations in loading the sodium hydrosulfite cargo proves that Waterman did not give this hazardous cargo the careful treatment that it deserved. For these reasons, this Court finds that Waterman was negligent in the handling of this particular hazardous cargo.

24. After cargo operations were completed in New Orleans, the SS Jeff Davis sailed for Montreal, Canada, to take on additional cargo.

25. During the passage from New Orleans to Montreal it was discovered that the No. 4 hold had water in it. Steps were taken to pump the water from the No. 4 hold and eventually that condition was controlled.

26. The engine room and the No. 5 hold were between the No. 4 and No. 6 holds.

27. In making her way to Montreal, the SS Jeff Davis was delayed by ice in the St. Lawrence River, first at Quebec and then at Three Rivers. She finally arrived at Montreal on January 22, 1981.

28. During the cargo operations in Montreal it was discovered that a weld was cracked in the No. 4 hold. Repairs were necessary, so the SS Jeff Davis proceeded to Halifax, Nova Scotia for repairs. The vessel was drydocked in Halifax and the crack was welded.

29. The work on the No. 4 hold was a long distance from the no. 6 hold, according to Captain Pointon, more than 100 feet away. No repair work done in the way of the No. 4 hold had any effect on cargo in the No. 6 hold.

30. Following the repairs in Halifax, the SS Jeff Davis returned to Montreal. Cargo operations were carried out until February 15, 1981. During that time additional cargo was loaded in the No. 6 lower hold, the No. 6 tween deck and deck cargo was loaded atop the No. 6 hatch. Nine tractors, each weighing in excess of 45 tons, were loaded in the vicinity of the No. 6 hatch. Three of these were stowed on top of the No. 6 hatch and three on each side of the hatch. The Captain testified that the vessel was not rigged so that she could move any of those tractors with her own gear. It would have been impossible to have removed any cargo from within the No. 6 hold while at sea. The Court finds the hazardous cargo was *not* stowed in a manner that would facilitate inspections, nor in a manner which allow for the hazardous cargo to be removed if a dangerous situation, like a fire, should arise, as 49 C.F.R. § 176.69(a) requires. This is another example of Waterman's negligent handling of this particular hazardous cargo.

31. Following the completion of cargo operations in Montreal, the Jeff Davis sailed for Leningrad, U.S.S.R. on February 16, 1981.

32. On February 17, 1981, a fire was discovered in the No. 6 hold of the Jeff Davis. No fire alarm went off.

33. After the fire, the vessel was diverted to Sept Isle and then to Quebec.

34. The vessel did not resume its voyage to Leningrad, U.S.S.R. until all the sodium hydrosulfite and the rest of the damaged cargo had been removed. The SS Jeff Davis finally departed Quebec on March 7, 1981.

35. Clause No. 15 of the Bill of Lading issued by Waterman provides that General Average shall be adjusted according to the York-Antwerp Rules 1974 and to matters not therein provided for, according to the laws and usages at New York. Two of the lettered rules of the York-Antwerp Rules, 1974 bear mentioning. Rules D and E provide as follows:

RULE D. Rights to contribution in General Average shall not be affected, though the event which gave rise to the sacrifice or expenditure may have been due to the fault of one of the parties to the adventure, but this shall not prejudice any remedies or defenses which may be open against or to that party in respect of such fault.

RULE E. The onus of proof is upon the party claiming in General Average to show that the loss of expense claimed is properly allowable as General Average.

36. According to the G.A. Adjuster from New York who testified in this matter, he is not concerned with liability or fault when preparing the G.A. statement. The rules allow the interested parties to determine liability and/or fault at a later date.

37. The Court cannot conclude with absolute certainty what caused the fire in question, however, mathematical certainty is not required. The Court does find that the fire was caused because of the improper stowage, improper handling, and failure to inspect and otherwise handle the cargo as required by the appropriate regulations mentioned above.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this admiralty action based on 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.

2. The rights and liabilities of the parties before the Court are governed by the Carriage of Goods by Sea Act, 46 U.S.C. 1301, et seq. (COGSA); the Fire Statute, 46 U.S.C. § 182; General Maritime law dealing with General Average; and the Bills of Lading which, inter alia, incorporate the York-Antwerp Rules 1974.

3. The COGSA fire exemption (unless caused by the actual fault or privity of the carrier) and the Fire Statute exemption (unless ... caused by the design or neglect of such owner) are the same as they affect this matter. *Complaint of Ta Chi Navigation (Panama) Corp.*, 677 F.2d 225, 228 (2d Cir.1982).

4. The regulations dealing with carriage of hazardous materials by vessel impose upon the carrier, Waterman Steamship Corporation in this case, the obligation to comply with the regulations. See, in particular, 49 C.F.R. §§ 176.39(a), § 176.30, 176.69(a), 176.57(a) and (c) and 176.58. Violation of these regulations, by which Waterman admitted it was bound, constitutes negligence on the part of the carrier which proximately caused or contributed to the fire. "Of course proximate cause in negligence will include a contributing cause and is not limited to the sole inducing reason for the damage." *Verbeeck v. Black Diamond Steamship Corp.*, 269 F.2d 68, 71 (2d Cir.), rehearing granted in part, 273 F.2d 61 (2d Cir.), cert. den., 361 U.S. 934, 80 S.Ct. 374, 4 L.Ed.2d 355 (1959).

5. The fire aboard the SS Jeff Davis on February 17, 1981, was caused by the "actual fault or privity" or neglect of Waterman Steamship Corporation, as those terms are used in the Fire Statute and COGSA, supra.

6. The improper stowage of the cargo of sodium hydrosulfite was known to, planned by and acquiesced in by Waterman Steamship Corporation through the actions of its managing officers or agents, who were in charge of the stowage and the cargo layout department.

7. Waterman Steamship Corporation accepted a hazardous cargo of sodium hydrosulfite knowing that it is a chemical which catches fire when it comes in contact with water, having done so, "it then accepted the obligation to carry [the cargo] safely." *Verbeeck v. Black Diamond Steamship Corp.*, 269 F.2d at 70 (2d Cir.1959).

■ 8. Waterman by stowing the hazardous cargo of sodium hydrosulfite in the No. 6 lower hold and then walling in the cargo with palletized tape in no way complied with the appropriate regulations. See, 49 C.F.R. §§ 176.39(a) and 176.69(a). The Court finds these actions by Waterman were negligent and rendered the vessel unseaworthy. *Verbeeck v. Black Diamond Steamship Corp.*, 269 F.2d at 70 (2d Cir. 1959); *Isbrandtsen Company v. U.S.*, 201 F.2d 281 (2d Cir.1953).

9. Waterman alleged in its counterclaim for General Average that the occurrence which placed the ship, cargo and the venture in immediate and serious peril was not caused by any fault or negligence nor any acts, omissions or causes whatsoever on its part nor was it responsible for the same by statute, contract or otherwise. The Court has determined that Waterman failed to prove these allegations.

10. In this case, there is an absence of direct proof as to the cause of the fire, which is often the case when damages results from a fire, simply because of the difficulties inherent in determining the real source. See, *Minerals & Chemicals Corp. v. S.S. National Trader*, 445 F.2d 831 (2d Cir.1971). However, causation of a fire can be ascertained through the "facts and circumstances" surrounding the incident viewed in "light of common experience". *United States v. Standard Oil Company of California*, 495 F.2d 911, 916 (9th Cir. 1974). The Court finds that Waterman's negligence in improperly handling and improper stowage of the hazardous cargo proximately caused the fire in question.

■ 11. It should be noted that there can be liability under the Fire Statute where the shipowner's negligence did not cause ignition of the fire but where damage to the cargo could have been prevented ... had it not been for the negligence of the shipowner. *Asbestos Corp. v. Compagnie De Navigation*, 480 F.2d 669, 672 (2d Cir.1973).

■ 12. Waterman was guilty of fault and is therefore precluded from recovering on its claim for General Average and is precluded from exemption under the Fire Statute and COGSA for the reasons set forth above.

13. To the extent that these Conclusions of Law constitute Findings of Fact, they are specifically adopted as both Conclusions of Law and Findings of Fact.

It is therefore ORDERED, ADJUDGED and DECREED that Waterman's claim against defendants should be and the same is hereby DISMISSED.

Judgment in accordance with the above Findings of Fact and Conclusions of Law will forthwith be entered.