**In re Petition of AMERICAN HISTORICAL ASSOCIATION, American Society of Legal History, Organization of American Historians and Society of American Archivists for Order Directing Release of Grand Jury Minutes.**

**No. M–11–189 (PKL).**

United States District Court,
S.D. New York.

May 13, 1999.

Vladeck, Waldman, Elias & Engelhard, P.C. New York City, Debra L. Raskin, of counsel, Public Citizen Litigation Group, Washington, DC, David C. Vladeck, of counsel, Brian Wolfman, of counsel, Lucinda A. Sikes, Sunnyvale, CA, for Petitioners.

Mary Jo White, United States Attorney for Southern District of New York, New York City, Jonathan A. Willens, of counsel, Michael G. McGovern, of counsel, for Respondent U.S.

### OPINION AND ORDER

LEISURE, District Judge.

A half century ago, Alger Hiss, a former high-ranking State Department official, was convicted for committing perjury in responding to allegations that he was a Soviet spy. The matter presently before the Court concerns the two special grand juries convened from 1947 to 1950 to investigate allegations of espionage, the first of which handed up the indictment underlying Hiss's conviction. Petitioners, a coalition of historical associations, move the Court for an order directing that transcripts of both special grand juries

pertaining to the investigation of Hiss be disclosed to the public. The Government opposes disclosure.

Because of the historical significance of most of the transcripts, the lack of need to keep the materials secret, the long passage of time since the special grand juries were convened, and the other reasons stated in this Opinion, petitioners' motion is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND [1]

Some explanation of the historical context in which the special grand jury investigations occurred is warranted.

In 1945, as World War II drew to a close, revelations occurred that before and during the war spies for the Soviet Union had infiltrated the United States government and stolen confidential information. One such exposé concerned an FBI raid on the New York City office of the *Amerasia* journal, which uncovered scores of classified documents originating from the War Department, State Department and others. Later that year, Igor Gouzenko, a Soviet defector to Canada, publicly confirmed that other confidential government documents had been funneled during the same period from the United States to the Soviet Union. Gouzenko stated that several unnamed, senior United States officials had been involved in the espionage.

Following these and other disclosures, two espionage investigations were initiated: one before Congress, and the other before a special grand jury impaneled on June 15, 1947, to conduct an investigation entitled *United States v. John Doe* (the

"*Doe I* grand jury"). The events occurring over the three-year period from June 1947 until June 1950 in connection with those two investigations are of principal concern here.

Congress's investigation proceeded before the revitalized House Un–American Activities Committee ("HUAC"), originally convened ten years earlier to inquire into alleged domestic subversive activities. Of special significance during the first year of the renewed HUAC hearings was the testimony in July 1948 of Elizabeth Bentley, an admitted member of a wartime Soviet spy ring based in Washington, D.C. Bentley identified several of her alleged spy contacts in the United States government, including William Walter Remington, a foreign trade expert in the Commerce Department, and Harry Dexter White, former Assistant Secretary of Treasury and then director of the International Monetary Fund.

Published accounts indicate that, during the same period, the *Doe I* grand jury proceeded with its espionage investigation and questioned several individuals, including government officials. On July 20, 1948, the grand jury returned indictments against a dozen high-ranking members of the American Communist Party, including the Party's presidential candidate, William Z. Foster. The indictments charged the individuals with conspiring to overthrow the United States Government in violation of the Alien Registration Act of 1940, commonly referred to as the Smith Act.[2] Public reports suggest the *Doe I* grand jury adjourned for several months following issuance of the indictments.

1. The factual background set forth herein is drawn from the publicly-filed submissions of the parties and the following published historical works: Eric F. Goldman, *The Crucial Decade: America 1945–1955* (1st ed.1956); David M. Oshinsky, *A Conspiracy So Immense* (1983); Sam Tanenhaus, *Whittaker Chambers* (1997); and Allen Weinstein, *Perjury: The Hiss–Chambers Case* (2nd ed.1997).

2. The Supreme Court affirmed the constitutionality of the Smith Act in *Dennis v. United States*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), a decision that itself has attracted academic and historical attention. *See, e.g.,* Gerald Gunther, *Learned Hand: The Man And The Judge* 598–607 (1994); Charles Fried, *Two Concepts of Interests: Some Reflections on the Supreme Court's Balancing Test,* 76 Harv. L.Rev. 755 (1963); Louis L. Jaffe, *The Supreme Court, 1950 Term—Foreword,* 65 Harv. L.Rev. 107 (1951).

In August 1948, soon after the American Communist Party members were indicted, Whittaker Chambers, a self-proclaimed member of the communist underground, testified at televised hearings before HUAC about his espionage activities. Chambers, then a senior editor of *Time* magazine, recounted that he had been an agent of the Soviet military intelligence agency, NKVD, from 1934 to 1938. Chambers further identified several government officials who allegedly were communists or communist sympathizers, and who purportedly attempted to influence United States policy in a manner favorable to the Soviet Union. Those individuals included Alger Hiss, then the director of the Carnegie Endowment for International Peace.

The allegations against Hiss received immediate and focused public attention. Hiss had been an academic star, graduating *magna cum laude* from Johns Hopkins University; attending Harvard Law School, where he was a member of the *Harvard Law Review*; and serving as law clerk to Justice Oliver Wendell Holmes, Jr. After spending several years with distinguished law firms in Boston and New York following his clerkship, Hiss entered the service of the United States government, where he held positions in the Agricultural Adjustment Administration ("AAA"); with the Nye Commission, which investigated the role of arms manufacturers in the entry of the United States into World War I; in the Solicitor General's Office, where he participated in defense of the constitutionality of the AAA before the Supreme Court; and, finally, in the State Department, where he remained for a decade and rose to the position of Director of the Office of Special Political Affairs. While at the State Department, Hiss was involved in several historic events of international significance, including participating in the Yalta Conference in February 1945 as a member of President Truman's delegation and, later, presiding as Secretary–General over negotiations leading to the signing of the United Nations Charter.[3]

In response to Chambers's allegations, Hiss appeared at a public hearing before HUAC and flatly denied both that he was a communist and that he knew Chambers. Following Hiss's denial, HUAC, led in part by Representative Richard Nixon, then a first-term Congressman, pursued a well-publicized investigation of the allegations. On August 17, 1948, Hiss and Chambers met in a private executive session of HUAC to elaborate on their assertions. Following the session, Hiss announced that he recognized Chambers as a freelance writer named George Crosley. Hiss again denied, however, that he was a communist and challenged Chambers to repeat his charges in a forum where they would not be privileged against suit for libel.

Chambers met the challenge. On August 27, 1948, Chambers stated on the radio broadcast of *Meet the Press* that Hiss was and might still be a communist, prompting Hiss to file suit against Chambers for libel in federal court in Baltimore, Maryland. During the course of discovery in the lawsuit, Chambers disclosed what he asserted was hard evidence that in addition to being a communist, Hiss was a full-fledged Soviet spy. On November 17, 1948, during his deposition in the case, Chambers produced the so-called "Baltimore Papers", summaries of State Department documents allegedly prepared by Hiss and given to Chambers to be passed to an intelligence officer of the Red Army. Further, on December 3, 1948, Chambers led HUAC investigators to his farm in Westminster, Maryland, where he retrieved what became known as the "Pumpkin Papers", several rolls of thirty-five millimeter film hidden in a hollowed-out pumpkin in the farm's pumpkin patch. The film revealed photographs of addition-

**3.** Hiss counted as friends and acquaintances such individuals as John Foster Dulles, Eleanor Roosevelt, Dean Acheson, Adlai Stevenson, and Justice Felix Frankfurter. Stevenson, Justice Frankfurter and Justice Stanley Reed would later testify as character witnesses on behalf of Hiss at his first perjury trial.

al State Department documents Chambers allegedly obtained from Hiss.

Published accounts indicate that on December 6, 1948, the *Doe I* grand jury reconvened to focus on the Hiss–Chambers controversy. According to those accounts, at least twenty-seven witnesses, including Chambers, Hiss and Nixon, testified before the grand jury during the subsequent ten-day period. *See* Declaration of Bruce Craig, dated December 9, 1998 [hereinafter "Craig Decl."], Ex. 1. On December 15, 1948, the last day it was convened, the *Doe I* grand jury indicted Hiss on two counts of perjury: first, for allegedly falsely testifying before the grand jury that he had never provided government documents to Chambers, and, second, for allegedly falsely testifying before the grand jury that he had not seen Chambers after January 1, 1937. After an initial trial on those charges ended with a hung jury, Hiss was convicted on both counts at a second trial.

On December 16, 1948, the day after the *Doe I* grand jury was dissolved, a second special grand jury was impaneled to continue investigating allegations of espionage (the "*Doe II* grand jury"). Published accounts of the *Doe II* grand jury proceedings are less extensive than those for the first grand jury. Public information does suggest the *Doe II* grand jury continued to inquire into Hiss's alleged espionage and also examined the adequacy of the previous investigation of his activities. Moreover, the grand jury apparently investigated allegations concerning individuals named by Elizabeth Bentley, including William Walter Remington. On June 8, 1950, a few days before its term expired, the *Doe II* grand jury indicted Remington for alleged perjury in denying he was a member of the communist party.

## PROCEDURAL BACKGROUND

The petition at bar is not the first to seek disclosure of information from the two special grand jury investigations. Because review of the previous disclosure requests provides additional context to the instant petition and is relevant to certain legal issues raised by this case, the Court provides a synopsis of those earlier proceedings, followed by a summary of the proceedings in the instant case.

## I. Previous Petitions for Disclosure of the Special Grand Jury Proceedings

There have been three previous petitions for release of portions of the special grand jury transcripts. The first request, in the mid–1970s, concerned the efforts of Hiss to obtain, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, *et seq.* ("FOIA"), materials from the FBI, Department of Justice and United States Attorney's Office for the Southern District of New York relating to their investigations of him. *See Hiss v. Department of Justice,* 441 F.Supp. 69, 70 (S.D.N.Y.1977); *see also* Craig Decl., Ex. 6. The requests apparently sought at least some of the grand jury transcripts petitioners now wish to have released.

In response to the requests, Harold R. Tyler, Jr., Esq., then Deputy Attorney General of the United States, announced that the Department of Justice had implemented a policy "to release as much information on the [Hiss case] as possible, with as little delay as possible", given the "historical significance" of the case. Craig Decl., Ex. 6. Consistent with that policy, Tyler further stated that exceptions to disclosure set forth in the FOIA were to be invoked only "if there is a compelling reason to do so", such as to protect specific privacy or law enforcement interests. *Id.; see also* 5 U.S.C. § 552(b) *passim* (materials may be withheld under FOIA where, among other things, privacy issues, trade secrets or certain law enforcement considerations are involved).

Tyler informed Hiss's counsel directly that processing of portions of Hiss's FOIA requests was barred by the grand jury secrecy provisions of Rule 6(e) of the Federal Rules of Criminal Procedure. *See* Craig Decl., Ex. 6; *see also* 5 U.S.C.

§ 552(b)(3)(A) (exempting materials from FOIA disclosure where required by statute). Tyler took the position, however, that the Department of Justice would not oppose an application by Hiss for a court order "to release the portions of the minutes requested by [Hiss] from the operation of Rule 6(e)." Craig Decl., Ex. 6; *see also* Declaration of Jonathan A. Willens, Esq., dated March 15, 1999 [hereinafter "Willens Decl."], Ex. B.

Following Tyler's suggestion, in 1977 Hiss sought in this District Court an order lifting Rule 6(e)'s prohibition "so that the [grand jury] information ... may be processed and released in accordance with [FOIA]". Craig Decl., Ex. 6; *see Hiss,* 441 F.Supp. at 70. Despite the Government's lack of opposition to Hiss's motion, the motion was denied. In so ruling, the District Court relied on the fact that Hiss's request did not fit within any enumerated Rule 6(e) exception, and that disclosure based on the putative historical significance of the materials "would be a mischievous precedent for this Court to establish." 441 F.Supp. at 71.

The second relevant request was made a decade later by Gary May, an associate professor of history at the University of Delaware. May brought suit in this District Court seeking disclosure of transcripts of the *Doe II* grand jury proceedings pertaining to the indictment of William Walter Remington. *See In re Petition of May,* 651 F.Supp. 457 (S.D.N.Y.1987) (unpublished memorandum and order). The Honorable Whitman Knapp, Judge of this Court, granted May's request based upon the undisputed historical significance of the Remington case, the extensive previous litigation regarding alleged improprieties in the *Doe II* grand jury proceedings, the long passage of time since the grand jury and trial proceedings had been completed, the extensive previous disclosure of portions of the grand jury transcripts, and the fact that the principals involved in the grand jury proceedings were either dead or had agreed to public disclosure of the substance of their grand jury testimony. *See id.* at 2–4. In so ruling, Judge Knapp relied on the ruling of the United States Court of Appeals for the Second Circuit in *In re Biaggi,* 478 F.2d 489 (2d Cir.1973), that "special circumstances" could warrant disclosure outside the confines of Rule 6(e). *See May, Opinion* at 2.

The third and final relevant request is that of Bruce Craig, a cold-war-era historian at the American University who is also a declarant in the instant case. In 1996, Craig sought in this District Court disclosure of the special grand jury testimony of Harry Dexter White before the *Doe I* grand jury. *See In re Petition of Craig,* 942 F.Supp. 881, 882 (S.D.N.Y.1996), *aff'd,* 131 F.3d 99 (2d Cir.1997). That request was denied in part due to Craig's failure to substantiate the alleged public interest in disclosure. *See id.* at 883. The District Court's holding was affirmed on appeal by the Second Circuit in an opinion, discussed in greater detail below, that confirms historical interest can in an appropriate case justify disclosure of grand jury materials. *See generally In re Petition of Craig,* 131 F.3d 99 (2d Cir.1997).

## II. The Instant Petition

On December 15, 1998, petitioners moved this Court for an order directing disclosure of the transcripts of both special grand juries pertaining to the investigation of Hiss. In support of their motion, petitioners have submitted an extensive declaration by Craig that summarizes publicly-available information regarding the Hiss matter and the grand jury proceedings, and that sets forth specific reasons why disclosure is allegedly warranted. Petitioners also have submitted declarations by ten other historians who attest to various allegedly historically significant aspects of the Hiss case and of the grand

jury records;[4] declarations by a documentary film maker, John Lowenthal, and a journalist, Victor Navasky, attesting to the continued public interest in the Hiss case and the grand jury records; and, finally, declarations by William F. Buckley, Jr., a journalist and close friend of Whittaker Chambers, Tony Hiss, the son of Alger and Priscilla Hiss, and Timothy Hobson, the son of Priscilla Hiss and a stepson of Alger Hiss, attesting, *inter alia*, that both Chambers and Hiss would have supported petitioners' motion were they still alive. Supplemental declarations also have been submitted by Craig, Hobson and Tony Hiss.

The Government opposes the petition. However, to facilitate assessment of the motion, and in lieu of submitting the several thousand pages of transcripts, the Government has provided the Court with a sealed *ex parte* summary of the testimony of each grand jury witness. The transcripts upon which the summary is based consist of seven numbered volumes (numbered 6, 8, 9, 10, 11, 12, and 14) and one unnumbered transcript.[5] *See* Willens Decl. *passim*. With respect to the *Doe I* grand jury, the transcripts include the proceedings from November 24, 1947, to April 7, 1948; on June 22, 23, and 29, 1948; and from October 19 to December 15, 1948. *See id.* ¶¶ 3-9. Regarding the *Doe II* grand jury, the transcripts include the proceedings from December 16, 1948, to January 6, 1949; from January 11 to January 27, 1949; from February 1 to February 16, 1949; and, finally, from April 12 to May 18, 1949. *See id.* ¶¶ 10-13. The first five volumes of the transcripts, as well as volumes 7 and 13 and the volumes concerning proceedings occurring after May 18, 1949, apparently have not been located. *See id.* ¶¶ 5, 7, 12, 13.

On May 12, 1999, this Court heard oral argument on petitioners' motion.

## DISCUSSION

### I. Standard of Decision

 The United States adheres to a tradition, "older than our Nation itself" and supported by countless precedents, that "proceedings before a grand jury shall generally remain secret". *Craig*, 131 F.3d at 101 (internal quotation marks and citations omitted). Many reasons have been offered for this presumption of secrecy, including (i) preserving the anonymity of grand jurors, which facilitates uninhibited deliberation and instills a sense that the grand inquest may lead wherever wrongdoing may exist; (ii) protecting grand jury witnesses from tampering and encouraging them to come forward and make full disclosure by providing assurance that what is disclosed, without counsel present, may remain secret unless they are called to testify in open court; (iii) furthering the governmental interest in avoiding alerting suspects to the investigation and to possible cooperating witnesses; and (iv) pro-

---

4. The historians are John Earl Haynes, Manuscript Historian for 20th Century Political History in the Manuscript Division of the Library of Congress; Laura Kalman, Professor of History at the University of California at Santa Barbara and President of the American Society for Legal History; Harvey Klehr, the Andrew W. Mellon Professor of Politics and History at Emory University; Walter Lafeber, the Marie Underhill Professor of American History at Cornell University; Anna Kasten Nelson, Distinguished Adjunct Historian in Residence at the American University; Ronald Radosh, Senior Research Associate at the Center for Communitarian Policy Studies, George Washington University, and President of the Historians of American Communism; Ellen W. Schrecker, Professor of American History at Yeshiva University; Athan G. Theoharis, Professor of History at Marquette University; Robert M. Warner, Professor Emeritus of History at the University of Michigan; and John W. Berresford, Adjunct Professor of Law at George Mason University Law School.

5. The summary lists the pagination in the numbered volumes as follows: 2425-3006 (Volume 6), 3305-3937 (Volume 8), 3938-4553 (Volume 9), 4554-5159 (Volume 10), 5160-5822 (Volume 11), 5823-6435 (Volume 12), and 6991-7486 (Volume 14). The Government has represented that the separate unnumbered transcript is not paginated and consists of approximately 111 pages.

tecting the reputations and well-being of innocent subjects of grand jury investigations, by attempting to keep them and the public at large ignorant of the proceedings, or at least by confining the extent of public disclosure. *See Douglas Oil Co. v. Petrol Stops Northwest,* 441 U.S. 211, 218–19, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979); *Butterworth v. Smith,* 494 U.S. 624, 636–37, 110 S.Ct. 1376, 108 L.Ed.2d 572 (1990) (Scalia, J., concurring); *Biaggi,* 478 F.2d at 491–92.

■ Provisions regarding grand jury secrecy have been codified in Rules 6(d) and 6(e) of the Federal Rules of Criminal Procedure. These rules do not provide for complete secrecy of grand jury proceedings. As an initial matter, they do not apply to grand jury witnesses. *See* Fed. R.Crim.P. 6(e)(2). Thus, pursuant to Rule 6(e)(2), any grand jury witness may disclose publicly anything that occurred therein, including the questions asked of the witness and the answers given. *See Butterworth,* 494 U.S. at 634–35, 110 S.Ct. 1376.

■ In addition to that potentially broad outlet for disclosure, Rule 6(e) sets forth several exceptions to the rule of secrecy. *See* Fed.R.Crim.P. 6(e)(3). These exceptions gradually have been adopted to reflect traditional practices of courts and evolving views as to the desirability of disclosure in certain circumstances. *See* Fed.R.Crim.P. 6 advisory committee notes *passim; see also Craig,* 131 F.3d at 102; *In re Petition to Inspect and Copy Grand Jury Materials,* 735 F.2d 1261, 1267–69 (11th Cir.) (Campbell, Pell and Kearse, JJ., all sitting by designation), *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984) [hereinafter *"In re Hastings"*]. A party seeking disclosure pursuant to a Rule 6(e) exception bears the burden of demonstrating a "particularized need" for the materials. *United States v. John Doe, Inc. I,* 481 U.S. 102, 104, 111–12, 107 S.Ct. 1656, 95 L.Ed.2d 94 (1987). Assessment of whether a particularized need has been established involves a flexible balancing of the need for secrecy against the need for disclosure. *See John Doe, Inc. I,* 481 U.S. at 112–17, 107 S.Ct. 1656; *see also Butterworth,* 494 U.S. at 632–33, 110 S.Ct. 1376; *United States v. Sells Engineering, Inc.,* 463 U.S. 418, 443, 445, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983); *Illinois v. Abbott & Associates, Inc.,* 460 U.S. 557, 567–68 n. 15, 103 S.Ct. 1356, 75 L.Ed.2d 281 (1983); *Douglas Oil Co.,* 441 U.S. at 222–23, 99 S.Ct. 1667.

■ Petitioners concede their disclosure request does not fall within any of the exceptions to secrecy currently enumerated in Rule 6(e). The petition instead asserts that the manifest historical importance of the materials justifies disclosure pursuant to the "special circumstances" exception to grand jury secrecy first enunciated by the Second Circuit in *In re Biaggi,* 478 F.2d 489 (2d Cir.1973). In the *Biaggi* case, the Court, in an opinion authored by Chief Judge Friendly, affirmed disclosure of the grand jury testimony of Mario Biaggi, a Democratic primary candidate for New York City mayor, even though the testimony did not fit within a Rule 6(e) exception. In so doing, the Second Circuit indicated that Rule 6(e) does not constitute a rigid limitation on disclosure; rather, disclosure, in Judge Friendly's words, ultimately "rests on the exercise of a sound discretion" that may be invoked to release materials outside Rule 6(e)'s exceptions when "the special circumstances of th[e] case" warrant. *Id.* at 494 (supplemental opinion). The exercise of such discretion, as demonstrated by the *Biaggi* Court, involves an especially careful analysis of whether the purposes underlying the presumption of grand jury secrecy would be undermined by disclosure, taking into consideration the specific facts of the case. *See id.* at 493. In *Biaggi,* the Second Circuit found "special circumstances" existed warranting disclosure, given that information about the grand jury proceedings had been leaked, that both the Government and Biaggi had requested disclosure to address a public

impression that Biaggi had invoked his Fifth Amendment privilege before the grand jury, and that the grand jury minutes could be redacted to protect the privacy of individuals not publicly identified in connection with the proceedings. *See id.* at 490–94.

The Second Circuit recently reaffirmed the *Biaggi* "special circumstances" exception and provided further explanation of its rationale and proper application. *See Craig*, 131 F.3d at 101–07. In *Craig*, the Second Circuit explained that disclosure of grand jury proceedings pursuant to the "special circumstances" exception is consistent with the vast discretion vested in federal courts regarding matters of grand jury secrecy. *See id.* at 102, 104. In addition, the Court stated that the exception appropriately accounts for Rule 6(e)'s history not as a straitjacket on courts but, instead, as a rule of decision that is responsive to courts' interpretation of the appropriate scope of grand jury secrecy. *Id.* The Court further noted the decisions of several other Courts of Appeals, including the Fourth, Seventh and Eleventh Circuits, finding disclosure permissible in certain circumstances even if no Rule 6(e) exception applies. *See id.* at 103 & n. 3–4; *see also In re Report and Recommendation of June 5, 1972 Grand Jury*, 370 F.Supp. 1219, 1229 (D.D.C.) [hereinafter *"In re Report and Recommendation"*], *mandamus denied sub nom. Haldeman v. Sirica*, 501 F.2d 714, 715 (D.C.Cir.1974) (en banc) (approving of district court's conclusion that disclosure is not limited only to the circumstances set forth in Rule 6(e)).

▮ Of particular significance to the instant case, the *Craig* decision clarifies that historical interest in grand jury materials may, in an appropriate case, constitute a "special circumstance" warranting disclosure. *See id.* at 105 ("Lest there be any doubt in the matter, ... we today hold that there is nothing ... that prohibits historical interest, on its own, from justifying release of grand jury material in an appropriate case."); *id.* ("It is, therefore, entirely conceivable that in some situations historical or public interest alone could justify the release of grand jury information."); *id.* at 106 ("Thus, far from being impermissible, an argument that significant historical interest militates in favor of release is totally appropriate and even weighty."); *id.* at 104 ("[W]e agree with the petitioner that ... an inflexible approach [that public interest in records can never warrant disclosure] would be inappropriate"). At the same time, however, the *Craig* decision makes clear that merely asserting a public and/or historical interest in grand jury materials will not suffice. *See id.* at 105. Courts may order disclosure pursuant to the "special circumstances" exception only upon a "fact-intensive" analysis of the reasons allegedly justifying disclosure, and only if the movant has satisfied a "burden ... greater" than the "particularized need" standard governing requests pursuant to an enumerated exception to the secrecy rule. *Id.* at 105–106 & n. 10. The Court suggested several factors that might prove useful to courts in making that inquiry, such as the identity of the petitioner, the materials requested, the specific reasons disclosure is sought, how long ago the grand jury proceedings occurred, whether portions of the materials previously have been disclosed, the need for maintaining secrecy—including consideration of the privacy interests of grand jury witnesses—and whether the Government opposes disclosure. *See id.* at 106.

Petitioners in the instant case argue that the circumstances of this case heavily favor disclosure of the grand jury materials at issue. Before petitioners' arguments may be tested, however, the Court must consider several general objections to disclosure raised by the Government.

## II. General Objections of the Government to Disclosure

The Government contends this Court need not reach consideration of the rea-

sons allegedly favoring disclosure because: (i) the "special circumstances" exception is not viable under controlling Supreme Court precedent; (ii) even if it is viable, historical interest alone cannot constitute a "special circumstance"; and (iii) even if historical interest could suffice, this Court should defer to previous decisions in this Circuit denying access to at least some of the grand jury materials at issue. For the reasons that follow, the Court rejects each of the Government's arguments.

### A. Viability of the "Special Circumstances" Exception

The Government asserts the "special circumstances" exception is inconsistent with the Supreme Court's decision in *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In *Williams*, the Supreme Court considered "whether a district court may dismiss an otherwise valid indictment because the Government failed to disclose to the grand jury 'substantially exculpatory evidence' in its possession." *Id.* at 37–38, 112 S.Ct. 1735. The Court held that a district court may not, because its supervisory power to regulate grand jury proceedings does not encompass enforcement of such a mandatory disclosure rule. *See id.* at 45–50, 112 S.Ct. 1735. Specifically, the Court found that with respect to prosecutorial conduct before a grand jury, a district court's supervisory power is generally limited to addressing violations of those " 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions' ". *Id.* at 46, 112 S.Ct. 1735 (quoting *United States v. Mechanik*, 475 U.S. 66, 74, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring in judgment)).

Speaking more broadly, the Court noted that federal courts' supervisory power to "fashion, on their own initiative, rules of grand jury procedure" is "very limited", and does not extend to "substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself." *Id.* at 50, 112 S.Ct. 1735. Applying this observation to the case before it, the Court found that imposition of the ethical rule threatened to transform the grand jury from an accusatory body to an adjudicative one by potentially unsettling well-established grand jury practice that only the prosecutor's view of the facts need be heard; that the investigative target is not entitled to a defense before the grand jury; that the grand jury itself is not obligated to consider exculpatory evidence; and that an indictment generally may not be challenged based on allegations that the evidence supporting indictment is insufficient or unreliable. *See id.* at 47–55, 112 S.Ct. 1735.

The Government contends the Second Circuit's "special circumstances" exception is invalid because it is premised upon an exercise of supervisory power that federal courts do not possess in light of *Williams*.

The Court considers *Craig* implicitly to have rejected the Government's reading of *Williams*. In *Craig*, decided five years after *Williams*, the Government "devote[d] much of its response to asserting that the district court ha[s] no authority even to consider departing from the confines of Rule 6(e)." 131 F.3d at 101; *see id.* at 103. This Court construes the Second Circuit's holding that "permitting departures from Rule 6(e) is fully consonant with the role of the supervisory court" to foreclose the argument now raised by the Government in slightly different clothing. *Id.* at 103.

In any event, the Court finds the Government's argument unpersuasive. The federal courts have a well-established supervisory role, and attendant supervisory power, regarding grand jury secrecy. *Williams* itself expressly so recognizes. *See* 504 U.S. at 46 n. 6, 112 S.Ct. 1735. In addition, and of particular importance here, a district court's ability to order release of grand jury materials has never been confined only to application of the exceptions to the secrecy rule specifically enumerated in Rule 6(e). To the contrary,

federal courts historically have exercised supervisory power in this area to develop exceptions to the rule of secrecy when appropriate. Thus, "recognition of the occasional need for litigants to have access to grand jury transcripts led to the provision in [Rule 6(e)(3)(C)(i)] that disclosure of grand jury transcripts may be made 'when so directed by a court preliminarily to or in connection with a judicial proceeding'." *Douglas Oil Co.*, 441 U.S. at 220, 99 S.Ct. 1667. And, as the Advisory Committee Notes to Rule 6 detail, it was the initiative of courts that prompted amendment of the rule to permit disclosure to personnel assisting government attorneys (6(e)(3)(A)); to other federal grand juries (6(e)(3)(C)(iii)); and to state authorities when the proceedings may disclose a violation of state criminal law (6(e)(3)(C)(iv)). *See* Fed. R.Crim. Pro. 6 advisory committee notes *passim*. The requirement that grand jury proceedings be recorded, relevant to grand jury secrecy, was also adopted in response to the trend among courts of mandating such recording. *See* Fed.R.Crim.P. advisory committee note to 1979 amendments. Other amendments to the secrecy rule reflect a similar sensitivity to evolving court practices. *See, e.g.*, Fed. R.Crim.P. 6 advisory committee note to 1983 amendments (discussing practices concerning closing of hearings on matters pertaining to grand jury proceedings); *id.* (reviewing positions of courts regarding sealing of grand jury subpoenas).

Thus, exceptions to the secrecy rule generally have developed through conformance of Rule 6 to the "developments wrought in decisions of the federal courts", not *vice versa*. *In re Hastings*, 735 F.2d at 1268; *see also id.* at 1269 (the "history of Rule 6(e) indicate[s] that the exceptions permitting disclosure were not intended to ossify the law, but rather are subject to development by the courts"); *Craig*, 131 F.3d at 102 (Rule 6(e) "reflects rather than creates the relationship between federal courts and grand juries" concerning grand jury secrecy); *Haldeman*, 501 F.2d at 715 (rejecting contention that Rule 6(e) elimi-

nates "the discretion ordinarily reposed in a trial court to make such disclosure of grand jury proceedings as he deems in the public interest"); *In re Report and Recommendation*, 370 F.Supp. at 1229 ("Rule 6(e) ... was not intended to create new law, [but] remains subject to the law or traditional policies that gave it birth.").

Nothing in *Williams* suggests the Court intended to halt this long-established and well-recognized process of development of the law of grand jury secrecy. Rather, the Supreme Court's rulings in this area indicate that the fashioning of such rules is fully consistent with, and a function of, the discretion long exercised by federal courts to develop substantive standards governing disclosure issues, *see John Doe, Inc. I,* 481 U.S. at 112, 107 S.Ct. 1656; *Sells Engineering, Inc.,* 463 U.S. at 443, 103 S.Ct. 3133, to determine in view of those standards when disclosure is appropriate, *see John Doe, Inc. I,* 481 U.S. at 116, 107 S.Ct. 1656; *Douglas Oil Co.,* 441 U.S. at 223, 99 S.Ct. 1667; *Pittsburgh Plate Glass Co. v. United States,* 360 U.S. 395, 399, 79 S.Ct. 1237, 3 L.Ed.2d 1323 (1959), and, in an exercise of supervisory power far more substantial than that at issue here, to dismiss indictments in certain circumstances due to violations of the secrecy rule, *see Bank of Nova Scotia v. United States,* 487 U.S. 250, 259, 263–64, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *Mechanik,* 475 U.S. at 74, 106 S.Ct. 938 (O'Connor, concurring in judgment).

■ It is, therefore, unquestionable that courts possess supervisory power to develop rules regarding this discrete aspect of grand jury procedure. *Williams*'s general admonition that courts' supervisory power to "fashion [grand jury] rules" is "very limited", 504 U.S. at 50, 112 S.Ct. 1735, does not contradict this view.

■ Of course, federal courts' supervisory power regarding grand jury secrecy is not unfettered. To be proper, exercises of such power must adequately safeguard the purposes underlying grand

jury secrecy and, more generally, as emphasized by *Williams*, must maintain the unique nature and position of the grand jury as an institution in our government. The only remaining issue regarding the validity of the "special circumstances" exception is, then, whether it conflicts with either of those considerations. The Court finds that it does not.

The Government offers no explanation of how the "special circumstances" exception might undermine the rule of grand jury secrecy. The *Craig* Court gave careful consideration to whether disclosure based on "special circumstances" would "unravel the foundations of secrecy upon which the grand jury is [now] premised." 131 F.3d at 103. The Court found that the exception would not because it is, by its very nature, applicable only in " 'exceptional circumstances' " and only when a nuanced, fact-intensive assessment indicates that publication of the proceedings would be " 'consonant with the [secrecy] rule's spirit and policy.' " *Id.* (quoting *Hastings*, 735 F.2d at 1269). Moreover, to ensure courts act with great vigilance in applying the exception, the Court clarified that a greater showing of "particularized need" must be made than would be required if the request were made pursuant to an enumerated exception. *See id.* at 106 n. 10.

Nor does the Government present any argument as to how the "special circumstances" exception might alter either the traditional function of the grand jury or its relationship with prosecutors, courts or other governmental institutions. The exception has no bearing on the process by which the grand jury makes charging decisions, and does not involve the use of any remedy that could upset those decisions

once made. *See Williams*, 504 U.S. at 47, 53, 112 S.Ct. 1735. In addition, unlike the conduct-regulating rule at issue in *Williams*, the "special circumstances" exception does not prescribe standards for governmental presentations to the grand jury or, indeed, purport to alter accepted rules as to any form of participation in those proceedings. *Id.* at 47, 112 S.Ct. 1735. The exception does not, moreover, impinge upon the total secrecy of grand jury deliberations, *see id.* at 48, 112 S.Ct. 1735; entitle a target to present a defense before the grand jury, *see id.* at 52, 112 S.Ct. 1735; or provide a basis for challenging an indictment based solely on alleged deficiencies in the evidence supporting it, *see id.* at 54, 112 S.Ct. 1735. In sum, none of the concerns expressed in *Williams* about the exercise of supervisory power over grand jury proceedings is implicated by the "special circumstances" exception. The exception fits comfortably within the sphere of discretion afforded to courts concerning matters of grand jury secrecy.

██ Accordingly, because the "special circumstances" exception is well-grounded in the federal courts' supervisory authority, the Court rejects the Government's argument for abandoning that exception.[6]

B. *Historical Interest as a "Special Circumstance"*

██ The Government further contends that even if the "special circumstances" exception is viable, historical interest cannot constitute a "special circumstance". There is no reason to tarry as to this argument. The *Craig* decision "hold[s]", "[l]est there be any doubt in the matter", that "there is nothing ... that prohibits historical interest, on its own, from justifying release of grand jury material in an

---

6. For the same reasons, the Court rejects the Government's contention that the "special circumstances" exception "circumvent[s] or conflict[s] with the Federal Rules of Criminal Procedure," *Carlisle v. United States*, 517 U.S. 416, 426, 116 S.Ct. 1460, 134 L.Ed.2d 613 (1996); *see also Bank of Nova Scotia*, 487 U.S. at 254, 108 S.Ct. 2369 (" 'use of the

supervisory power ... is invalid if it conflicts with constitutional or statutory provisions.' ") (quoting *Thomas v. Arn*, 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985)), an argument the Government repeats from the *Craig* appeal. *See* Brief for the United States of America in *Craig v. United States*, No. 96-6264, dated March 3, 1997, at 5–9.

appropriate case." 131 F.3d at 105; *cf. Butterworth*, 494 U.S. at 632–33, 110 S.Ct. 1376 (weighing First Amendment interests against need for secrecy); *Abbott & Associates, Inc.*, 460 U.S. at 567–68 n. 15, 103 S.Ct. 1356 (public interest relevant to particularized need assessment). This Court is bound by *Craig*'s holding. *See Close v. State of New York*, 125 F.3d 31, 38 (2d Cir.1997). To the extent *Craig*'s discussion of this issue could be construed as *dictum*, the Court finds it persuasive.

### C. *Previous Decisions*

Finally, the Government urges this Court to defer to the two previous decisions in this Circuit refusing to disclose certain of the transcripts of the special grand jury proceedings now at issue. For the reasons that follow, the Court finds neither of those decisions controlling or persuasive in this case.

### 1. *The Hiss Decision*

As previously described, in 1977 the District Court denied Hiss's petition requesting release of grand jury materials that presumably overlap to an extent with the materials sought by the instant petition. *See Hiss v. Department of Justice*, 441 F.Supp. 69 (S.D.N.Y.1977).

■■■ The Government does not assert any form of privity exists between petitioners and Hiss. Absent such a relationship, the *Hiss* decision cannot have preclusive effect here. *See South Cent. Bell Tel. Co. v. Alabama*, — U.S. ——, ——, 119 S.Ct. 1180, 1185, 143 L.Ed.2d 258 (1999); *National Labor Relations Bd. v. Thalbo Corp.*, 171 F.3d 102, 109–110 (2d Cir.1999).

The Court finds, moreover, that the *Hiss* decision is not otherwise entitled to deference. First, the Court is not convinced the *Hiss* decision applied the appropriate legal standard in denying Hiss's petition. Specifically, the decision makes no mention of *Biaggi*'s holding that considerations beyond those enumerated in Rule 6(e) may justify disclosure. Instead, curi-

ously, the *Hiss* decision relies on *Biaggi* for the proposition that disclosure may only be ordered if the request falls within (as of that time) the "three and only three" exceptions set forth in Rule 6(e). 441 F.Supp. at 70.

Second, while at the time the *Hiss* decision was rendered there may have existed no authority clearly indicating that disclosure may be premised on historical interest, *see id.* at 71 (finding "no support" for that "mischievous" proposition), subsequent decisions have brought greater clarity to the subject. Reassessment of the need for secrecy is, therefore, warranted in light of the more developed legal framework now in existence.

Accordingly, given these considerations, the Court does not find the *Hiss* decision controlling or otherwise entitled to deference.

### 2. *The Craig Decision*

Also previously described in this Opinion is the District Court's denial in 1996 of Craig's petition seeking disclosure of Harry Dexter White's testimony before the *Doe I* grand jury. *See In re Petition of Craig*, 942 F.Supp. 881 (S.D.N.Y.1996), *aff'd*, 131 F.3d 99 (2d Cir.1997). The Government contends the *Craig* decision is preclusive as to the instant petition because petitioners allegedly were privies of Craig. *See* Government's Memorandum of Law in Opposition, dated March 15, 1999 [hereinafter "Opposition"], at 31.

■■■ The Government devotes one short paragraph to this preclusion argument, and its precise scope is unclear. The Government does not state whether preclusion principles are invoked only as to petitioners' request for the testimony of White, or, instead, more broadly regarding petitioners' entire request. Since the Government obviously bears the burden of proof as to its argument, *see Computer Associates Intern., Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir.1997), its failure to

delineate what preclusion it seeks itself merits rejection of the argument.

In any event, regardless of the scope of the Government's contention, the argument fails because the Government has not fulfilled its burden to prove that (i) Craig and petitioners were privies, and (ii) the same claims are raised in both proceedings.

### a. *Privity*

 The Government has not established petitioners were privies of Craig. "In its modern form, the principle of privity bars relitigation of the same cause of action ... where the new [party] has a sufficiently close relationship to the original [party] to justify preclusion." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 367–68 (2d Cir.1995). None of the traditional indicia of privity has been shown to be present here, such as a trust relationship, control of the previous litigation by petitioners, evidence that Craig was vested with the authority to represent petitioners, or some other agreement by petitioners to be bound by the prior judgment in a manner different than "a decided case binds every citizen." *South Central Bell. Tele. Co.,* —— U.S. at ——, 119 S.Ct. at 1185; *see also Tourangeau v. Uniroyal, Inc.,* 101 F.3d 300, 307 (2d Cir.1996).

Nor has the Government attempted to show petitioners' interests were "virtually identical" to Craig's such that petitioners may be deemed otherwise to have been represented in the prior proceeding. *Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343, 345 (2d Cir.1995); *see also Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.,* 31 F.3d 89, 103 n. 22 (2d Cir.1994) (virtual representation may exist where nonparty has "the same interests" as party to previous case) (internal quotation marks and citation omitted). Craig was a doctoral candidate seeking review of materials for use in his dissertation. *See Craig,* 131 F.3d at 101. Petitioners, by contrast, are four historical associations with a nationwide membership and interests that are undisputedly far broader and more varied. The many different and, in some instances, conflicting historical interests asserted by the various declarants supporting the petition amply demonstrate that proposition. Thus, while some common ground could be said to have existed between Craig and petitioners, Craig's historical interests were not sufficiently representative of the more diverse interests of petitioners to warrant a finding of privity. *See, e.g., Tarpley v. Salerno,* 803 F.2d 57, 60 (2d Cir.1986) (per curiam).

 Moreover, even insofar as there was overlap of interests, the Court finds those common interests were not "adequately represent[ed]" by Craig in the prior litigation. *Chase Manhattan,* 56 F.3d at 345 (internal quotation marks and citation omitted); *see also Thalbo,* 171 F.3d at 110 (interest must "in a meaningful sense [be] represented in the prior proceeding" for preclusion to apply). Craig's petition was premised on conclusory assertions that there was a general public interest in White's testimony. *See Craig,* 942 F.Supp. at 883 ("[Craig] simply asserts that the public interest in the case justifies disclosure."); *Craig,* 131 F.3d at 105 (Craig made "blanket assertion that the public has an interest in the information"). Petitioners, by contrast, have explored virtually all facets of whether disclosure is warranted, including detailing numerous, specific historical issues to which the grand jury materials are allegedly relevant, premised upon a comprehensive review of all publicly-available information concerning the Hiss case. They have, moreover, garnered, in addition to the backing of Craig (and, assumedly, the endorsement of their own memberships generally), the ardent support of ten historians, many eminent in their respective fields; well-known journalists; a documentary film-maker; and friends and family of Hiss and Chambers. Of course, mere lack of success in the prior proceeding does not

mean there was inadequate representation there. *See Amalgamated Sugar Co., LLC v. NL Indus., Inc.*, 825 F.2d 634, 641 (2d Cir.1987). With that principle in mind, however, the paucity of Craig's petition, contrasted with, or even considered wholly apart from, the quality of the instant petition, leads the Court to find that Craig did not adequately represent petitioners' common interests.

■ At bottom, the only tangible support for the Government's privity argument is that some of the historical associations which are petitioners here filed an *amicus curiae* brief in support of Craig's appeal from the denial of his petition. *See* Opposition at 31 & n. 24. In the circumstances of this case, that fact does not support a finding that petitioners either substantially participated in the prior litigation or otherwise were adequately represented in it. If anything, their participation only at the appellate stage, and only in their capacity as friends of the Court, suggests the opposite conclusion.[7]

The Court, therefore, finds petitioners and Craig were not privies.

b. *Identity of Claims*

■ The other fundamental deficiency in the Government's preclusion argument is that it has failed to attempt to show at all, much less with "clarity and certainty", *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 117 F.3d 674, 677 (2d Cir.1997) (internal quotation marks and citation omitted), that each petition concerns the same "claim", or "nucleus of operative fact". *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir.1997). The Second Circuit embraces a narrow view as to what constitutes an identical claim:

With respect to the determination of whether a second suit is barred by res judicata, the fact that both suits involved essentially the same course of wrongful conduct is not decisive; nor is it dispositive that the two proceedings involved the same parties, similar or overlapping facts, and similar legal issues. A first judgment will generally have preclusive effect only where the transaction or connected series of transactions at issue in both suits is the same, that is where the same evidence is needed to support both claims, and where the facts essential to the second were present in the first.

*Computer Associates Intern., Inc.*, 126 F.3d at 369 (quoting *Interoceanica Corp.*, 107 F.3d at 91). There is added reason narrowly to construe this concept in connection with a request for disclosure of grand jury materials under the "special circumstances" exception, since the broader the nucleus of operative fact is deemed, the more potential requests relating to a particular grand jury investigation must be raised in a single proceeding, making it more difficult for the parties and the court to engage in the "fact-intensive ... inquiry that is to be conducted" in applying the exception. *Craig*, 131 F.3d at 105–06; *see also id.* at 107 n. 11.

■ Craig's petition sought only the testimony of White before the *Doe I* grand jury. The instant petition seeks a much broader range of materials spanning both special grand jury proceedings. In addition, to the extent the petitions overlap, the evidence submitted in support of disclosure, and the rationale for disclosure, is different in each case. Craig sought disclosure of White's testimony based on its asserted relevance to the allegations against White. *See Craig*, 131 F.3d at 101. Petitioners, in contrast, seek that testimony based on its alleged relevance to allega-

---

7. The Government does not contend petitioners' decision to retain for this proceeding the lawyers who represented Craig in the prior proceeding supports a finding of privity. *See* Opposition at 30–31; *see also South Central Bell Tel. Co.*, —— U.S. at ——, 119 S.Ct. at

1185 (similar circumstances "created no special representational relationship between the earlier and later plaintiffs. Nor could these facts have led the later plaintiffs to expect to be precluded, as a matter of res judicata, by the earlier judgment itself").

tions against a different and undisputedly more important historical figure, Hiss, as well to a number of broader historical issues. In view of these differences, the Court finds the petitions involve different claims.

Accordingly, for all the reasons stated, the Court finds the *Craig* decision does not preclude all or even part of the instant petition.

The Government appears to have abandoned its estoppel claim during oral argument; indeed, the Government went so far as to criticize petitioners for contending it had made such a claim. Thus retreating from the position taken in its papers, *see* Opposition at 31, during argument the Government focused instead on its remaining salvo that deferring to the *Hiss* and *Craig* decisions would deter repetitive or frequent petitions for grand jury materials. The Government has cited no legal authority requiring or even authorizing a district court to decline to hear a petition on that basis. Adoption of such a blanket, policy-driven limitation would conflict with both the particularized assessment of each petition required by controlling law and with the common-sense notion that secrecy needs and the historical importance of materials may change over time. *See Craig,* 131 F.3d at 104–107; *id.* at 107 n. 11 (denial of petition should not "be read to suggest that future developments might not change matters.").

At the same time, the Government has not substantiated the threat it seeks to deter. The Hiss grand jury investigation itself is a strong counterpoint to the alleged potential for vexatious litigation—other than the current request, there has been only one request for materials directly relating to the investigation of Hiss in the past twenty years. That history suggests existing preclusion principles are an adequate safeguard. Accordingly, the Court declines the invitation to avoid re-

view of the merits of the petition based on the deterrence value that allegedly would be achieved.

Having addressed the Government's general objections, the Court proceeds to consider the merits of petitioners' request.

## III. Merits of the Petition

 Petitioners seek disclosure of the special grand jury transcripts relating to the investigation of Hiss. Cognizant of the factors outlined in *Craig* and of this Court's duty narrowly to tailor any relief afforded, *see Douglas Oil Co.,* 441 U.S. at 222, 99 S.Ct. 1667; *Craig,* 131 F.3d at 106, the Court finds that petitioners have satisfied their burden to show an especially significant, particularized need justifying disclosure of most of the requested materials.

### A. *Need to Maintain Secrecy*

Aside from its generic objections to disclosure, the Government does not contend there is any particular reason to keep secret the fifty-year old grand jury materials at issue. No national security interest is asserted and, with a few exceptions addressed below, no privacy concerns are raised. In addition, significantly, the Government proffers no argument that disclosure would undermine any of the rationales for maintaining grand jury secrecy.

In view of the Government's failure to identify any material need to keep the grand jury materials secret, the Court wonders why the Government opposes disclosure at all. Its opposition on the merits is especially perplexing given the earlier position of the Department of Justice not to oppose Hiss's own efforts to release grand jury materials from the operation of Rule 6(e). *See Hiss,* 441 F.Supp. at 70 ("The government does not oppose the application. Indeed, the government's response may fairly be read as supporting the motion.").[8]

---

8. The Government asserts its position in the *Hiss* case does not contradict its current posi-

tion. Its argument is that the *Hiss* petition only sought release of the grand jury materi-

Of course, the Government's failure to specify a need for secrecy does not end the analysis. A court must always, in analyzing a petition for disclosure of grand jury materials, conduct a thorough assessment on its own accord of the extent to which a need for secrecy exists. The Court turns to that assessment.

Several of the reasons for maintaining secrecy dissolved when the special grand jury investigation ended in 1950. As the Supreme Court has noted in this regard:

> When an investigation ends, there is no longer a need to keep information from the targeted individual in order to prevent his escape—that individual presumably will have been exonerated, on the one hand, or arrested or otherwise informed of the charges against him, on the other. There is also no longer a need to prevent the importuning of grand jurors since their deliberations will be over.

*Butterworth,* 494 U.S. at 632–33, 110 S.Ct. 1376. Moreover, when all appeals on convictions stemming from the special grand jury investigations were resolved, the goal of protecting from tampering or retaliation grand jury witnesses who could be called at trial also disappeared.

Only two potential interests in secrecy remain: (i) the forward-looking interest in ensuring future grand jurors and grand jury witnesses will not be inhibited due to the possibility of subsequent disclosure of proceedings based on historical interest; and (ii) an interest in protecting the privacy of any subjects of the Hiss investigation whose identities have not previously been disclosed.

The first such interest should not be underestimated; careful consideration must always be given to "the possible effect upon the functioning of future grand juries." *Douglas Oil Co.,* 441 U.S. at 222, 99 S.Ct. 1667. In the present circumstances, however, the Court is persuaded that any potential hindrance caused by disclosure would be negligible. Were this Court to order disclosure, it would be for historical reasons fifty years after the proceedings ended. The inhibiting effect of such disclosure is insignificant, especially when compared with far more immediate potential causes of disclosure, such as leaks, general press attention, public statements by witnesses and revelations at trial. Indeed, in cases of historical moment, the often extensive contemporaneous attention given to the case is likely to magnify the importance of those more proximate causes of disclosure in the minds of potential jurors and witnesses, and make the possibility of disclosure decades hence based on historical interest seem a trifling concern, or even an inevitability.

Moreover, insofar as jurors and witnesses are made aware of how disclosure lawfully may occur, the effect of release of the Hiss materials is attenuated by the fact that historical interest already has been invoked in other cases to disclose grand jury materials, including materials of a younger vintage at the time of disclosure than those sought here. *See May,* Opinion at 3 (ordering disclosure 35 years after special grand jury investigation of

---

als to the Department of Justice. Here, by contrast, the Government argues, if the petition were granted, then the materials would be released directly to petitioners and, presumably, to the general public.

Although not material to the Court's decision, the Government's characterization attempts to create a distinction without a difference. Hiss sought an order allowing grand jury materials to be "processed and [then] *released* under [FOIA]." Craig Decl., Ex. 6 (emphasis added). The Department of Justice did not object to either portion of that request; its concern was simply that it be able to review the materials prior to disclosure to determine whether FOIA disclosure prohibitions other than Rule 6(e) applied. *See* Willens Decl., Ex. B; *see also* Craig Decl., Ex. 6. In other words, the Department of Justice did not object to ultimate public disclosure of appropriate portions of the grand jury materials; here, by contrast, the Government does so object. The Government's current position would, therefore, appear to be in clear conflict with its previous stance.

William Walter Remington); *In re Petition of O'Brien*, No. 3–90–X–95 (M.D.Tenn. May 16, 1990) (unpublished opinion) (ordering disclosure approximately 45 years after grand jury investigation of race riots).

Privacy concerns also are of limited importance in the instant case. Of those witnesses whose testimony the Court deems relevant to the Hiss investigation, the Government has identified a small number as potentially raising privacy concerns. *See* Government's *ex parte* submission, dated March 15, 1999, Ex. A.[9] The Court finds that additional *ex parte* briefing by the Government explaining the privacy concerns is necessary in order for the Court properly to weigh the relevant considerations. In the meantime, those pages shall remain secret.

Regarding the rest of the relevant witnesses, the absence of privacy concerns is attributable to two facts. First, the witnesses' involvement with the investigation is public knowledge, as is the substance of portions of some of their grand jury testimony. This disclosure has occurred in a variety of ways, including through entry of verbatim passages of grand jury testimony into the record at both of the trials of Hiss; trial testimony by several grand jury witnesses; public disclosure of detailed grand jury notes taken by several witnesses; publication of biographies and autobiographies of witnesses; revelations in newspapers based on leaks and interviews with witnesses; and related testimony of many grand jury witnesses before HUAC. *See* Craig Decl. ¶¶ 119–125; *see also id.,* Ex. 6 (memorandum of Harold R. Tyler, Jr., Esq., identifying several putative grand jury witnesses as having "no general privacy interest sufficient to support withholding under [FOIA]").

Second, during the past five decades most of the relevant witnesses have died. The principal parties, Chambers and Hiss,

are deceased and, significantly, testimony has been submitted that they would have supported disclosure. As to the remaining witnesses whose status has been identified (comprising about half of the total witnesses who provided testimony relating to Hiss), all but two are dead, and one of those witnesses, Timothy Hobson, has submitted a declaration in favor of disclosure. *See* Declaration of Timothy Hobson, dated October 27, 1998; *see also* Supplemental Declaration of Timothy Hobson, dated April 15, 1999. The Government does not dispute petitioners' contention that the witnesses whose status is not known are likely to be deceased.

Thus, with the possible exceptions noted, the Court finds that the need to maintain secrecy in order to protect privacy interests is insignificant.

### B. *Historical Importance of the Materials*

 Weighed against the minimal interest in preserving secrecy is the great historical importance of the Hiss case generally and of the specific grand jury materials at issue.

### 1. *General Historical Importance of the Case*

Alleged Soviet espionage against the United States was a controversial, highly-visible and significant issue in domestic politics during the 1940s and 1950s. Of all the events pertaining to that issue, the Hiss case is among the most historically important.

In its own time, the case was widely publicized. *See* Declaration of Walter Lafeber, dated December 4, 1998 [hereinafter "Lafeber Decl."], ¶ 3. News of the proceedings frequently captured front-page headlines, and there was in-depth coverage of the backgrounds and activities of Cham-

---

9. The testimony is located at the following transcript pages: 2425–2471, 2510–2559, 2637–2649, 2803–2916, 2954–3006, 3305–3453, 3731, 3982–4019, 5847–5862, 7129–7147 and 7210–7240.

bers, Hiss and other grand jury witnesses. *See, e.g.,* Craig Decl., Ex. 5.

The case continued to receive significant attention in the decade following Hiss's conviction. Both Hiss and Chambers published books in the 1950s regarding the case and the grand jury proceedings. *See* Whittaker Chambers, *Witness* (1952); Alger Hiss, *In the Court of Public Opinion* (1957). Hiss maintained he had not committed perjury or been a Soviet spy, and suggested his indictment and conviction were the result in part of efforts by members of HUAC, especially Richard Nixon, to use the case to mobilize public opposition to communism. Chambers, in contrast, maintained that Hiss was a Soviet spy.

As is evident, even in the years immediately following Hiss's conviction the significance of the case was not limited merely to the issue of Hiss's guilt or innocence. The case was, and is, also an important facet of the broader historical debate over the extent of wartime Soviet espionage in the United States and the propriety of the investigations thereof. Thus, also during the 1950s, academic works and other publications addressed the significance of the Hiss case to whether allegations of Soviet infiltration of high levels of government were overblown and, even if not, whether governmental responses to those concerns were appropriately measured. *See, e.g.,* Alistair Cooke, *A Generation on Trial; USA v. Alger Hiss* (1952); Eric F. Goldman, *The Crucial Decade: America 1945–1955* (1956); William Allen Jowitt, *The Strange Case of Alger Hiss* (1953).

Debate about the Hiss case continued through the 1960s and 1970s and was rekindled in particular upon publication of *Perjury,* Alan Weinstein's seminal historical work on the case. *See* Alan Weinstein, *Perjury: The Hiss–Chambers Case* (1st ed.1978); *see also* Richard M. Nixon, *Six Crises* (1962); John Chabot Smith, *Alger Hiss: The True Story* (1976). Moreover, in the late 1970s and early 1980s, attention was brought to the case by Hiss himself

through FOIA requests for materials and filing of a writ of *coram nobis* challenging his conviction. With respect to the FOIA requests, the United States government announced that release of materials should occur with "as little delay as possible", given, among other things, the case's "historical significance". Craig Decl., Ex. 6.

To the present day, interest in the case persists among historians and the public. Indeed, if anything, attention given to the case has recently intensified. *See generally* Hubert B. Herrino, *Unraveling the Hiss Case,* N.Y. Times, Dec. 20, 1998, § 4, at 2. The renewed historical interest is due in part to disclosure by the United States government of Soviet consular messages intercepted during World War II as part of the so-called "VENONA" intelligence program, and to the recent release of materials from the intelligence archives of several former Soviet-bloc countries. Both of these sources have sparked renewed debate among historians and commentators about whether Hiss was a Soviet spy, the extent of Soviet espionage generally, and whether the government's espionage investigations were justified. *See* John Earl Haynes & Harvey Klehr, *Venona: Decoding Soviet Espionage in America* (1999); Alan Weinstein & Alexander Vassiliev, *The Haunted Wood: Soviet Espionage in America—The Stalin Era* (1998); Alan Weinstein, *Perjury: The Hiss–Chambers Case* (2nd ed.1997); *see also* Ethan Bronner, *Witching Hour: Rethinking McCarthyism, if Not McCarthy,* N.Y. Times, Oct. 18, 1998, § 4, at 1 (discussing intelligence disclosures and Hiss case); *Revisionist McCarthyism,* N.Y. Times, Oct. 23, 1998, at A22 (similar); David Oshinsky, *McCarthy, Still Unredeemable,* N.Y. Times, Nov. 7, 1998, at A15 (similar). Hiss's death in 1996, and his insistence even immediately prior thereto that he was completely innocent, led to further reflection about the case and the political times of which it was a part. *See, e.g.,* Martin Walker, *A Loss of Convictions Since Hiss,* L.A. Times, Nov. 24, 1996, at M1; Henry

Grunwald, *Remembering Alger Hiss*, Wall St. J., Nov. 21, 1996, at A22. Other recent publications also have contributed to rejuvenated discussion of the case. *See* Sam Tanenhaus, *Whittaker Chambers* (1997) (biography); Daniel Patrick Moynihan, *Secrecy: The American Experience* (1998) (assessing United States secrecy policies).[10]

Given the minimal need for keeping the grand jury materials secret, the sustained and widespread historical interest in the Hiss case may well be sufficient in itself to justify disclosure of the materials under the standard outlined in *Craig. See* 131 F.3d at 107 ("if historical interest in a specific case has persisted over a number of years, that serves as an important indication that the public's interest in release of the [grand jury] information is substantial."). The public must acquire, at an appropriate time, a significant, if not compelling, interest in ensuring the pages of history are based upon the fullest possible record. This would seem especially so where, as here, a case fosters vigorous and sustained debate not only about the case itself, but also about broader issues concerning fundamental and, at times, countervailing aspects of our democracy— freedom of expression, privacy, consent as citizens to a democratic form of government, governmental investigative power, separation of powers, and the role and function of grand juries themselves. Access to such information inevitably enhances the accuracy of history and undermines the false conspiracy theories and revisionism that tend to arise when information remains secret. Moreover, disclosure can only, in the long run, build confidence in our government by affirming that it is open, in all respects, to scrutiny by the people. Perhaps no public institution

ultimately should be excepted from that principle of openness, not even those institutions, such as grand juries, that in theory serve as a "kind of buffer or referee between the Government and the people." *Williams*, 504 U.S. at 47, 112 S.Ct. 1735.

Whether that showing would be sufficient is academic, however, because petitioners do not rest their case solely or even principally upon such general arguments. Rather, in addition to establishing that the Hiss case generally is of great historical importance, petitioners have asserted several specific reasons why disclosure of the requested grand jury materials is necessary, which reasons the Court now addresses.

### 2. *Specific Historical Importance of the Grand Jury Materials*

Petitioners assert the grand jury materials are likely to contain information important to numerous specific historical issues. Having reviewed petitioners' arguments in conjunction with the Government's *ex parte* summary of the relevant grand jury testimony, the Court finds the grand jury materials are indeed significant at least with respect to the following four issues.[11]

### a. *Involvement of HUAC in the Grand Jury Proceedings*

Historians continue to attempt to discern the extent to which HUAC was involved in the grand jury proceedings and may have influenced the decision to indict Hiss. *See* Craig Decl. ¶¶ 17, 126; Declaration of Ellen W. Schrecker, dated September 26, 1998 [hereinafter "Schrecker Decl."], ¶ 6. In this regard, it is currently well known that Richard Nixon testified before the grand jury and there is speculation that he essentially lobbied it to indict

10. One final indication of the historical importance of the Hiss case is the maintenance by academic and historical institutions of papers and collections regarding it. Those institutions include the National Archives and Harvard University, which houses the Hiss defense files.

11. Consistent with Rule 6(e), this decision discusses only at a very general level whether there is a particularized need for release of the materials based on their relevance to the historical issues addressed.

Hiss for perjury and not to indict Chambers and, perhaps, others.

The Court finds the public has a significant interest in disclosure of Nixon's testimony. Grand jury testimony by a congressional official allegedly attempting to influence a grand jury's charging decisions is of inherent and, substantial historical importance. It raises concerns about separation of powers, grand jury independence and potential abuse of power. It takes on added historical significance when the witness later becomes the President of the United States. Confirmation of what was actually said by Nixon will significantly enrich the debate about the propriety of that testimony and its importance to the grand jury's decision to indict.

In addition, the transcripts contain other historically significant information regarding the issue of HUAC involvement in the grand jury proceedings.

### b. *Allegations Concerning Hiss*

Historical debate also continues as to whether Hiss was a Soviet spy, whether he committed perjury and, even if he was guilty in either respect, why others were not indicted, such as Chambers, whose version of events apparently changed several times. *See* Allen Weinstein, *Perjury: The Hiss–Chambers Case* xvii (2nd ed.1997) ("although almost a half-century has passed since the jury at Alger Hiss's second trial pronounced him guilty of perjury, the case remains controversial and the verdict leaves questions unanswered. Did Hiss become an undercover Communist while serving as a New Deal official? Did he turn over classified State Department files to Whittaker Chambers ... ? Or did Chambers, for obscure and malevolent reasons, deliberately set out to frame and destroy a respected public official?"); *see also* Declaration of Laura Kalman, dated November 28, 1998, ¶ 5; Declaration of Harvey Klehr, dated September 29, 1998 [hereinafter "Klehr Decl."], ¶¶ 4–8; Declaration of Anna Kasten Nelson, dated November 1, 1998, ¶ 7; Supplemental Decla-

ration of Bruce Craig, dated April 21, 1999, ¶¶ 15–18. The Court finds the requested grand jury information is significant to those issues.

### c. *Soviet Espionage Activity in the United States*

Historical debate has been renewed about the extent of Soviet espionage activity in the United States during and following World War II. *See generally* Allen Weinstein, *Perjury: The Hiss–Chambers Case* 504–513 (2nd ed.1997); Klehr Decl. ¶¶ 5–8; Lafeber Decl. ¶¶ 5–7; Declaration of Victor S. Navasky, dated December 2, 1998, ¶¶ 3–6. Disclosure of the requested grand jury materials would provide additional and historically important insight into such activities.

### d. *Alleged Improprieties in the Doe II Grand Jury*

As previously noted, on December 16, 1948, following the indictment of Hiss, the *Doe II* grand jury was convened. According to published reports, the new grand jury continued to investigate the espionage allegations against Hiss and other government officials, including William Walter Remington. *See* Craig Decl. ¶ 84.

There has long been historical debate about alleged abuses in the *Doe II* grand jury proceedings. During his service as foreman of that grand jury, John Brunini collaborated with Elizabeth Bentley, a principal grand jury witness, in her efforts to publish a memoir. *See id.* ¶ 128. Moreover, the presenting prosecutor before the grand jury, Thomas J. Donegan, previously had been Bentley's attorney. *See id.* Aside from, or perhaps in part related to, these potential conflicts of interest, there were allegations that the foreman and prosecutor were abusive to witnesses during the proceedings, especially during the testimony of Remington's wife, Ann.

Although Remington never succeeded in obtaining dismissal of his indictment based on these alleged improprieties, in consider-

ing his appeals several judges expressed serious concern regarding the proceedings. The eminent jurist Learned Hand, dissenting from the Second Circuit's decision of an appeal by Remington, found upon review of the relevant grand jury transcripts that the treatment of Ann Remington "went beyond what [is] permissible." *United States v. Remington,* 208 F.2d 567, 572 (2d Cir.1953). The potential misconduct included the grand jury's denial of her requests to consult with her attorney and to have a break from the lengthy questioning to eat; lecturing of her regarding the grand jury's powers; and false assertion that she could not rely upon the spousal privilege to refuse to testify. *See id.* at 571–72.

Similar concerns were expressed by Justice Black in dissent from the denial of Remington's petition for a writ of certiorari in a related appeal. *See Remington v. United States,* 343 U.S. 907, 908, 72 S.Ct. 580, 96 L.Ed. 1325 (1952) (Black and Douglas, JJ., dissenting). Justice Black noted that the government's failure to disclose Brunini's relationship with Bentley "is abhorrent to a fair administration of justice [and] approaches the type of practices unanimously condemned by this Court as a violation of due process of law". *Id.*

In part because of these alleged abuses, in 1987 Judge Knapp ordered disclosure of the grand jury transcripts relating to Remington's indictment. *See May,* Opinion at 4. Judge Knapp noted that "the public has a strong interest in having its understanding of the administration of justice in this case based on complete and accurate historical evidence." *Id.* Disclosure of the materials was followed by publication of a historical book concerning the Remington case and the alleged abuses before the *Doe II* grand jury. *See* Gary May, *Un–American Activities: The Trials of William Remington* (1994).

Petitioners contend the transcripts of the *Doe II* grand jury involving investigation of Hiss are important to historical assessment of whether improprieties occurred during that part of the investigation. The Court agrees. The materials would materially benefit debate not only about those particular grand jury proceedings but also regarding prosecutorial power and grand jury independence generally.[12]

\* \* \* \* \* \*

Giving due consideration to the Government's objections; weighing the minimal need to maintain secrecy of the grand jury transcripts, the substantial and particularized showing of their historical significance, and the other factors outlined in *Craig* and otherwise required under the "particularized need" standard for disclosure; and considering the unique circumstances of the case, including the allegations of several distinct forms of grand jury improprieties, the Court finds petitioners have fulfilled their burden to justify disclosure of the following transcript pages: 2472–2509, 2560–2636, 2650–2802, 2917–2953, 3455–3730, 3732–3981, 4020–5846, 5863–6117, 6127–6435, 7023–7128, 7148–7209, and 7241–7429. The Court has tailored the disclosure to include only materials bearing on the four historical issues addressed.

The Court is confident that disclosure will fill in important gaps in the existing historical record, foster further academic and other critical discussion of the far-ranging issues raised by the Hiss case, and lead to additional noteworthy historical works on those subjects, all to the immense benefit of the public. The materials should languish on archival shelves, behind locked doors, no longer.

**CONCLUSION**

For the reasons stated above, the petition is hereby GRANTED in part and

---

12. The Court finds no merit in petitioners' remaining contention that disclosure would materially benefit historical debate regarding the propriety of the FBI's activities during this period. *See* Memorandum in Support of Petition, dated December 15, 1998, at 26–27.

DENIED in part. The Government's *ex parte* brief elaborating on the alleged privacy concerns raised by certain transcript pages shall be filed by May 21, 1999.

**SO ORDERED.**